[No. C014286. Third Dist. Nov. 5, 1993.]

BRIGHT DEVELOPMENT, Plaintiff and Appellant, v.
CITY OF TRACY, Defendant and Respondent.

## COUNSEL

Neumiller & Beardslee, Steven A. Herum, Thomas H. Terpstra, Carrie L. Brown and George A. Petrulakis for Plaintiff and Appellant.

Ferella, Braun & Martel, Jane Felder and Nancy J. Koch for Defendant and Respondent.

## OPINION

**PUGLIA, P. J.**—Plaintiff Bright Development appeals from a judgment denying its petition for writ of mandate and complaint for declaratory relief. The trial court ruled plaintiff, a developer, was required "to underground" off-site utilities related to a new subdivision constructed by plaintiff.[1] The trial court found that on the date plaintiff's vesting tentative map application for the proposed subdivision was deemed complete, a City of Tracy ordinance, policy or standard then "in effect" required plaintiff to place underground at its own expense existing, off-site, aboveground utilities.[2] (See Gov. Code, § 66474.2.)

On appeal, plaintiff contends (1) the trial court erred in allowing defendant City of Tracy (City) to supplement the administrative record and to introduce new evidence; and (2) the record does not contain substantial evidence to support the finding that at the time plaintiff's vesting tentative map application was deemed complete, City had an ordinance, policy or

---

[1] The verb "to underground" means "To lay [utility] cables below ground level." (4 Oxford English Dict. (Supp. 1986) p. 1073.)

[2] As used herein, "off-site" utilities are those located outside the exterior boundary of the subdivision.

standard "in effect" requiring the developer at its own cost to underground existing off-site utilities. Implicit in plaintiff's second contention is the claim that even if such a policy or standard was in effect, it cannot be applied to plaintiff because plaintiff had no notice of it. We shall reverse.

I

Government Code sections 66498.1-66498.9 permit a subdivider to file a "vesting tentative map" whenever the Subdivision Map Act requires the filing of a tentative map. (See Gov. Code, § 66498.1, subd. (a).)[3] The most notable feature of a vesting tentative map is that on its approval or conditional approval, the right vests in the subdivider to proceed with development in "substantial compliance with the ordinances, policies and standards" in effect on the date on which the subdivider's application was deemed complete. (Gov. Code, § 66474.2, subd. (a).)[4]

---

[3]Government Code section 66498.1 provides: "(a) Whenever a provision of this division requires that a tentative map be filed, a vesting tentative map may instead be filed. [¶] (b) When a local agency approves or conditionally approves a vesting tentative map, that approval shall confer a vested right to proceed with development in substantial compliance with the ordinances, policies, and standards described in Section 66474.2. However, if Section 66474.2 is repealed, that approval shall confer a vested right to proceed with development in substantial compliance with the ordinances, policies, and standards in effect at the time the vesting tentative map is approved or conditionally approved. [¶] (c) Notwithstanding subdivision (b), the local agency may condition or deny a permit, approval, extension, or entitlement if it determines any of the following: [¶] (1) A failure to do so would place the residents of the subdivision or the immediate community, or both, in a condition dangerous to their health or safety, or both. [¶] (2) The condition or denial is required, in order to comply with state or federal law. [¶] (d) The rights conferred by this section shall expire if a final map is not approved prior to the expiration of the vesting tentative map. If the final map is approved, the rights conferred by this section shall be subject to the periods of time set forth in subdivisions (g) and (h) of Section 66452.6. [¶] (e) Consistent with subdivision (b), an approved or conditionally approved vesting tentative map shall not limit a local agency from imposing reasonable conditions on subsequent required approvals or permits necessary for the development and authorized by the ordinances, policies, and standards described in subdivision (b)."

[4]At the relevant time, Government Code section 66474.2 provided: "(a) Except as otherwise provided in subdivision (b) or (c), in determining whether to approve or disapprove an application for a tentative map, the local agency shall apply only those ordinances, policies, and standards in effect at the date the local agency has determined that the application is complete pursuant to Section 65943 of the Government Code. [¶] (b) Subdivision (a) shall not apply to a local agency which, before it has determined a tentative map to be complete pursuant to Section 65943, has done both of the following: [¶] (1) Initiated proceedings by way of ordinance, resolution, or motion. [¶] (2) Published notice in the manner prescribed in subdivision (a) of Section 65090 containing a description sufficient to notify the public of the nature of the proposed change in the applicable general or specific plans, or zoning or subdivision ordinances. [¶] A local agency which has complied with this subdivision may apply any ordinances, policies, or standards enacted or instituted as a result of those proceedings which are in effect on the date the local agency approves or disapproves the

Plaintiff purchased approximately 40 acres of land in City with the intent to subdivide and then construct homes on the property. On May 1, 1989, plaintiff filed a vesting tentative map application with City. The vesting tentative map application was deemed complete by operation of law on June 29, 1989 (Gov. Code, § 65943, subd. (a)).[5] It was approved by City's planning commission on August 9, 1989. The approval included those conditions listed by City's public works department in its June 23, 1989, report.

When the vesting tentative map application was deemed complete, the ordinances, policies and standards in effect included the Tracy Residential Area Specific Plan (Specific Plan), the City of Tracy Design Standards (Design Standards), the City of Tracy Standard Specifications (Standard Specifications), and the City of Tracy Standard Plans (Standard Plans).

In December 1990, approximately 16 months after plaintiff's vesting tentative map was approved and 19 months after the application was deemed complete, City amended the Design Standards and the Standard Specifications. City added section 3.13 to the Design Standards, which requires subdividers at their own expense to underground existing off-site utilities.[6] City also amended section 306 of the Standard Specifications to require the undergrounding of existing overhead utilities "in accordance with City policy and requirements." The preamble to Resolution No. 90-484 which added section 3.13 to the Design Standards and amended section 306 of the Standard Specifications states such action was designed "to clarify and memorialize existing City Council policy regarding undergrounding of utilities . . . ."

Thereafter, a dispute arose between plaintiff and City concerning whether plaintiff was required at its own expense to underground existing off-site

---

tentative map. [¶] (c) If the subdivision applicant requests changes in applicable ordinances, policies or standards in connection with the same development project; any ordinances, policies or standards adopted pursuant to the applicant's request shall apply." (As amended by Stats. 1988, ch. 548, § 1.)

Government Code section 66474.2 has since been amended nonsubstantively (see Stats. 1989, ch. 847, § 10, p. 2792.)

[5]The application is deemed complete if within 30 days after its receipt, the local agency has not made a written determination whether or not it is complete. (Gov. Code, § 65943, subd. (a).)

[6]Section 3.13 of the Design Standards states: "All subdivisions and major developments, in accordance with City policy, shall underground all new services and existing fronting overhead utilities in either public utility easements or within the public right-of-way pursuant to Section 3.02 of these Standards. Installation of said underground utilities shall be in accordance with the specifications of the respective utilities. Where corner properties are undergrounding existing fronting overhead facilities and those facilities continue across the fronting streets, the developer shall be responsible for undergrounding to the street right-of-way line opposite the development."

utilities fronting the proposed subdivision.[7] City demanded plaintiff remove existing public utilities outside the boundary of plaintiff's subdivision and bury them in a public utility easement which was also outside the boundary of plaintiff's subdivision.

Plaintiff disputed City's claim that plaintiff was required to underground existing off-site utilities.[8] Plaintiff appealed the imposition of the undergrounding requirement to both the City Planning Commission and the city council. Plaintiff also submitted letters to City staff and to the City council protesting the imposition of the undergrounding requirement. Plaintiff's protests were rejected.

In order to allow the project to continue while reserving its right to challenge the off-site undergrounding condition, plaintiff filed a letter of protest (Gov. Code, § 66020) and thereafter at its own expense undergrounded the utilities in question.[9]

In July 1991, plaintiff commenced the instant proceeding for mandate and declaratory relief, relying for the former remedy upon Code of Civil Procedure sections 1085 and 1094.5. Plaintiff's petition and complaint sought a peremptory writ of mandate commanding City to refrain from imposing amended design improvements on plaintiff's project and a declaration that plaintiff is not required to comply with such design amendments.

Plaintiff also filed a request for preparation of the administrative record. The request directed City to prepare a record "of all proceedings before the Tracy Planning Commission and City Council relative to City's review and approval of [plaintiff's] project. The Record should include, but not be limited to, the approved vesting tentative and final subdivision maps, all staff reports and exhibits, [and] the subdivision agreement executed by the parties . . . ."

In response, City prepared and sent to plaintiff the "administrative record." In January 1992, plaintiff lodged the "administrative record" with the superior court and so notified City.

---

[7] The record contains a letter from Pacific Gas and Electric Company (PG&E) to City regarding the question whether plaintiff is required to underground existing fronting off-site utilities. The letter states in part: "[T]here [] appears to be some confusion between the City and the developer as to what is being required at this location."

[8] Plaintiff conceded it was required to underground existing on-site utilities, i.e., those facilities within the boundary of the subdivision.

[9] Government Code section 66020, subdivision (a), allows a developer to protest the "imposition of any fees, dedications, reservations, or other exactions imposed on a residential housing development by a local agency" by paying the fees under protest, obtaining the necessary approvals or permits, and thereafter proceeding with the project while pursuing an action to challenge the action of the local agency. (See *Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 241 [1 Cal.Rptr.2d 818].)

Thereafter, City lodged with the trial court materials which it claimed it had inadvertently omitted from the administrative record. These materials consisted of documents exceeding 130 pages, none of which were included in the "administrative record" which City had supplied to plaintiff and plaintiff had lodged with the court. In addition to the "inadvertently omitted" materials, City filed declarations from its public works director and other City employees purporting to detail the history of City's undergrounding policy as well as the conditions City intended to impose on plaintiff's subdivision development.

Plaintiff objected to City's attempt to supplement the administrative record and to the declarations offered by City. The trial court overruled the objections and admitted the supplemental materials and the declarations.

The matter was tried to the court which rendered findings and conclusions including the following:

"1. Beginning in 1981, [City] implemented an unwritten policy requiring developers . . . to pay for undergrounding of existing utilities in connection with developing major subdivisions ('Undergrounding Policy'). . . .

"3. Since its implementation in 1981, and all times material to this dispute, [City's] Undergrounding Policy has been uniformly and consistently enforced by the Tracy Department of Public Works. . . .

"4. On December 22, 1987, the Tracy City Council adopted Standard Plans. . . . These plans provide that electric, cable television and telephone lines must be placed in an underground trench.

"5. The Tracy City Council adopted Standard Specifications on November 1, 1988. Section 306 of the Standard Specifications provided: 'Underground conduit construction shall include all utility piping such as sewer, water, storm drain, etc. . . .'

"7. On or about May 22, 1989, a [] representative [of plaintiff] attended a meeting of [City's] Development Review Committee where [plaintiff's] obligation to comply with the Undergrounding Policy was explicitly discussed.

"8. On June 23, 1989, before [plaintiff's] Vesting Map application was deemed complete, [City's] Public Works Department recommended imposition of Standard Condition No. H.5 ('Condition H.5') on the Vesting Map. . . .

"9. Both parties agree that [plaintiff's] Vesting Map is properly subject to Condition H.5. Under Condition H.5, installation of underground services are [*sic*] required to be paid for by [plaintiff]. Moreover, [plaintiff] was required to install underground services as prescribed by the various 'City Standards,' including the Standard Plans and Standard Specifications described above. . . .

"11. On December 4, 1990, Section 306 of the Standard Specifications was amended to reflect [City's] pre-existing Undergrounding Policy . . . .

"12. Also on December 4, 1990, [City's] Council added Section 3.13 to the 1988 Design Standards ('Standard 3.13'). Standard 3.13 reflected [City's] longstanding policy of requiring undergrounding for existing fronting utilities . . . .

"13. [B]ased upon the above Findings of Fact, the court DENIES issuance of the writ of mandate sought by [plaintiff]. [Plaintiff] is bound by the 'ordinances, policies and standards' in effect at the time its Vesting Map Application was deemed complete. Government Code §§ 66498.1(b) and 66474.2(a). The Court finds that [City's] policies and standards concerning undergrounding of existing fronting overhead utilities as of the date that [plaintiff's] Vesting Map application was deemed complete were sufficient to be a condition of [plaintiff's] Vesting Map. Said policies and standards required [plaintiff] to underground the disputed utilities at its own expense. [Plaintiff] had actual and constructive notice of the Undergrounding Policy.

"Accordingly, judgment is hereby entered against [plaintiff] and in favor of [City]." (Italics in original.)

## II

The Subdivision Map Act (Act) permits a subdivider to file a "vesting tentative map" whenever the Act requires a tentative map. This procedure is intended to provide greater statutory protection to subdividers than was afforded under the common law vested rights doctrine. (Gov. Code, §§ 66498.1-66498.9; Cal. Subdivision Map Act Practice (Cont.Ed.Bar 1987) § 6.31; Curtin, Subdivision Map Act Manual (1992) p. 13.)

The intent of the Legislature in enacting the vesting tentative map statute (Gov. Code, §§ 66498.1-66498.9) is spelled out in Government Code section 66498.9: "By the enactment of this article, the Legislature intends to accomplish all of the following objectives: [¶] (a) To establish a procedure for the approval of tentative maps that will provide certain statutorily vested rights

to a subdivider. [¶] (b) To insure that local requirements governing the development of a proposed subdivision are established in accordance with Section 66498.1 when a local agency approves or conditionally approves a vesting tentative map. The private sector should be able to rely upon an approved vesting tentative map prior to expending resources and incurring liabilities without the risk of having the project frustrated by subsequent action by the approving local agency . . . ."

Government Code sections 66498.1-66498.9 were enacted in response to the erosion of the common law doctrine of vested rights. (Cal. Subdivision Map Act Practice, *supra*, §§ 6.28, 6.31; Curtin, Subdivision Map Act Manual, *supra*, pp. 12-13.) The Legislature enacted these provisions to freeze in place those "ordinances, policies and standards in effect" at the time the vesting tentative map application is deemed complete. (Cal. Subdivision Map Act Practice, *supra*, § 6.31.) These provisions enable the private sector to rely on vesting maps to plan and budget development projects. (Gov. Code, § 66498.9, subd. (b).) "The vesting tentative map statute now offers developers a degree of assurance, not previously available, against changes in regulations." (Longtin's California Land Use (2d ed. 1987) § 6.50[2]; Subdivision Map Act Manual, *supra*, pp. 13, 15.)

III

In their briefs on appeal, both parties operate under the mistaken assumption the underlying proceeding is one for administrative mandamus. (Code Civ. Proc., § 1094.5.)[10] Based on that misconception, plaintiff argues in its brief that the trial court erred in allowing City to introduce additional evidence in the form of declarations of City employees.[11]

Code of Civil Procedure section 1094.5, subdivision (a), provides administrative mandamus is available to review a decision made by an agency as a result of a proceeding in which by law (1) a hearing is required to be given, (2) evidence is required to be taken, and (3) discretion in determining the facts is vested in the agency. This section applies to administrative proceedings that are quasi-judicial in character. (*Shapell Industries, Inc.* v. *Governing Board, supra*, 1 Cal.App.4th at p. 231.) "Since such a proceeding adjudicates individual rights and interests, findings are required and the

[10]At oral argument, however, counsel for City suggested the underlying proceeding might in fact be one for traditional mandamus. (Code Civ. Proc., § 1085.)

[11]"Ordinarily [in proceedings under Code of Civil Procedure section 1094.5], no evidence other than the administrative record may be introduced at the trial. [Citation.] The judge, sitting without a jury . . . decides essentially on the basis of the record, which may be augmented only within the strict limits of [ ] § 1094.5[(e)]." (Cal. Administrative Mandamus (Cont.Ed.Bar 1989) § 4.112, p. 166.)

reviewing court looks to see whether the findings are supported by the evidence. [Citations.]" (*Ibid.*)

Neither plaintiff nor City has directed our attention to any legal authority requiring a hearing in the administrative proceedings involving plaintiff and City, or that evidence be taken, or that City thereafter exercise its discretion in determining the facts. Moreover, while plaintiff's opening brief suggests the proper standard of review of this court is to "decide whether [City's] findings and decision were supported by substantial evidence [Code of Civil Procedure section 1094.5]," plaintiff did not cite to the administrative record where such "findings," required in quasi-judicial agency proceedings, could be found.[12]

It appears City imposed the off-site undergrounding requirement as a condition for approval of plaintiff's final subdivision map. In order to secure final approval and allow the project to continue, plaintiff complied with the off-site undergrounding requirement "under protest" and thereafter filed the underlying lawsuit. With specific regard to the undergrounding requirement, however, it does not appear an adjudicatory-type hearing was held or findings made. Indeed, it does not appear there were any quasi-judicial proceedings whatsoever. (Cf. *Prip* v. *City of Santa Barbara* (1963) 214 Cal.App.2d 626, 631 [29 Cal.Rptr. 558].)

In imposing the off-site undergrounding requirement City was acting in an administrative capacity. (See *Johnston* v. *Board of Supervisors* (1947) 31 Cal.2d 66, 74 [187 P.2d 686], disapproved on other grounds in *Bailey* v. *County of Los Angeles* (1956) 46 Cal.2d 132, 139 [293 P.2d 449].) If City had an off-site undergrounding ordinance, policy or standard in effect at the time plaintiff's vesting tentative map was deemed complete, then, in the exercise of its administrative power, City could properly impose that requirement as a condition for final approval of the project. (See *ibid.*; Gov. Code, § 66474.2, subd. (a).) If, however, defendant had no off-site undergrounding ordinance, policy or standard in effect at that time, or, if it did but

---

[12]At oral argument counsel for plaintiff referred this court to various parts of the administrative record wherein the requisite "findings" are located. These references include a planning commission "Staff Report" and a City council resolution "Approving the Inspection and Public Improvements Agreement for [plaintiff's] Development," but neither the staff report nor the resolution was the result of quasi-judicial proceedings within the meaning of Code of Civil Procedure section 1094.5. Plaintiff also directed our attention to a "Report of Actions" by City's planning commission, which noted that at an earlier hearing the planning commission approved plaintiff's proposed development and adopted certain findings. Again, however, there is nothing in the record which suggests the generic findings contained therein were the result of a "*final* administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the . . . tribunal[.]" (Code Civ. Proc., § 1094.5, subd. (a), italics added.)

plaintiff had no notice or reasonable means of acquiring notice of it, its imposition of the off-site undergrounding requirement as a condition for approval of plaintiff's project constitutes an unlawful exercise of its administrative power, i.e., an abuse of discretion. (See *A.B.C. Federation of Teachers* v. *A.B.C. Unified Sch. Dist.* (1977) 75 Cal.App.3d 332, 340 [142 Cal.Rptr. 111].)

█ "While mandamus will not lie to control the discretion exercised by a public officer or board . . . it will lie to correct an abuse of discretion by such officer or board." (*Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 823 [25 Cal.Rptr. 798]; see *Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 344, fn. 24 [124 Cal.Rptr. 513, 540 P.2d 609]; see also Cal. Civil Writ Practice (Cont.Ed.Bar 1987) § 5.3, p. 153 ["Mandate [may issue] against a local legislative body that acts without power or refuses to obey the plain mandate of the law."].) Such a proceeding is one in traditional mandamus. (Code Civ. Proc., § 1085; *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 601-602 [45 Cal.Rptr. 512]; Cal. Civil Writ Practice, *supra*, §§ 5.1-5.3, 5.5, pp. 149-153, 154-156 ["Administrative officers and agencies are subject to review by traditional mandate . . . and not to review by administrative mandamus . . . for relief from . . . abuse of discretion in those situations in which by law no hearing is required." (*Id.*, at p. 155.)].)

In a traditional mandamus proceeding, the question of abuse of discretion turns not on whether the agency's findings are supported by substantial evidence (cf. Code Civ. Proc., § 1094.5, subd. (b)), but whether the agency's action was arbitrary or capricious. (See *Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626, 639 [12 Cal.Rptr. 671, 361 P.2d 247]; Cal. Civil Writ Practice, *supra*, § 5.1, p. 150.) █ And in a traditional mandamus proceeding, the parties may present evidence outside the administrative record. (*Sierra Club* v. *Gilroy City Council* (1990) 222 Cal.App.3d 30, 40 [271 Cal.Rptr. 393]; *Western Mun. Water Dist.* v. *Superior Court* (1986) 187 Cal.App.3d 1104, 1112 [232 Cal.Rptr. 359].) Accordingly, the trial court did not err in allowing the declarations to be received in evidence.[13]

### IV

█ We consider whether the record establishes City had an ordinance, policy, or standard in effect at the time plaintiff's vesting tentative map application was deemed complete.

---

[13]This analysis also disposes of plaintiff's claim the trial court erred in allowing City to supplement the administrative record with materials City claimed had been inadvertently omitted from that record. Regardless of whether these materials had in fact been inadvertently omitted or simply constituted additional evidence which City wished the court to consider, the trial court could properly receive them in evidence in a traditional mandamus proceeding.

City asserts it has a long-standing undergrounding policy for off-site utility services which is reflected in several written, public standards which were in effect on June 29, 1989, the date plaintiff's vesting tentative map application was deemed complete. City refers specifically to the Standard Plans enacted December 22, 1987, as well as to the Standard Specifications, the Design Standards, and condition H.5, which was expressly imposed as a condition for approval of plaintiff's vesting tentative map. As we shall explain, none of the sources cited by City mentions, much·more requires, that a developer at his own expense underground existing *off-site* utilities.

The relevant Standard Plans, adopted in December 1987, consist of various maps, diagrams and schematic drawings depicting the undergrounding of various utilities, such as electric lines, cable television and telephone lines. The requirements as depicted, however, relate solely to *on-site* improvements.

At the time plaintiff's map application was deemed complete, the Standard Specifications did not expressly require undergrounding of existing off-site utilities. Indeed, the Standard Specifications implied the contrary. Thus, section 7.10 of the Standard Specifications stated a contractor should use caution to protect the public and private property situated adjacent to the development, and must "repair or replace all existing improvements (e.g., curbs, sidewalks, driveways, fences, signs, utilities, street surfaces, structures, etc.) damaged or removed as a result of his operations." Such repairs and replacements are to be "at least equal to existing improvements." It appears this section required only that a contractor repair or replace existing off-site utilities which he damaged and/or removed in his operations.

Moreover, prior to the 1990 amendment to section 306 of the Standard Specifications, that section stated in relevant part: "Underground conduit construction shall include all utility piping such as sewer, water, storm drain, etc. and shall conform to the provisions of Section 306 of the Standard Specifications for Public Works Construction . . . as modified by the City Standard Specifications herein." Again, however, this section made no mention of any requirement to underground existing off-site utilities.

The Standard Plans, adopted in 1987, state only with regard to utilities: "Gas, electric and telephone utilities are considered to have no special design requirements other than those required by the individual agencies involved."

City argues the Standard Specifications and Standard Plans apply to plaintiff because these regulations were imposed on plaintiff's vesting tentative map via condition H.5 of the development conditions. Condition H.5

states in relevant part: "Underground services shall be installed at the subdivider's expense in the P.U.E. locations prescribed by the City Standards, Pacific Gas and Electric Company, Pacific Telephone Company and the U.A. Cablesystems of California and approved by the City Engineer."

However, nothing in condition H.5 makes any mention of an undergrounding requirement for *off-site* utilities. It appears the "City Standards" referred to in condition H.5 were the Design Standards. However, when plaintiff's vesting tentative map application was deemed complete, the Design Standards did not include any off-site undergrounding requirement. To the extent the "City Standards" referred to in condition H.5 were meant to impose the applicable Standard Plans on plaintiff's subdivision, the Standard Plans relate exclusively to on-site improvements. Finally, as we have noted, prior to the 1990 amendment to section 306 of the Standard Specifications, nothing contained therein imposed a requirement for placing existing off-site utilities underground. Certainly condition H.5 did not require plaintiff at its own expense to underground off-site utilities.

City argues "the unrebutted evidence shows that the Standard Plans, Standard Specifications and Condition H.5 have been consistently interpreted and applied for over 10 years by [City] to require private developers to underground off-site utilities . . . . [¶] . . . [S]ince 1981, [City] has consistently applied its policy of undergrounding utilities to developers of major subdivisions. [] Developers of all major subdivisions fronting on Tracy Boulevard have been required to underground existing off-site utilities at their own expense. [] Approval of these developer's vesting tentative maps was consistently conditioned upon compliance with [defendant's] policy of undergrounding via language identical to Condition H.5 . . . ."

In support of this claim, City cites exclusively to the declarations of its employees received in evidence by the trial court. The declarations are entitled to little weight in resolving the issue whether, at the time plaintiff's vesting tentative map application was deemed complete, City had an ordinance, policy or standard in effect which required developers at their own expense to underground off-site utilities. City has not shown a written ordinance, policy or standard so requiring was in effect. At best the declarations tend to show no more than that the declarant City employees believed there was such an unwritten policy in effect. But the declarations do not establish whether the "policy" existed outside the minds of these employees.

V

Plaintiff asserts there was nothing which would have placed it on notice that the cost of the development would include undergrounding existing off-site utilities.

■ As stated, in enacting the vesting tentative map statute (Gov. Code, §§ 66498.1-66498.9), the Legislature sought, among other things, to ensure that "The private sector [would] be able to rely upon an approved vesting tentative map prior to expending resources and incurring liabilities. . . ." (Gov. Code, § 66498.9, subd. (b).) If developers had no knowledge or reasonable means of acquiring knowledge before "expending resources and incurring liabilities" of the ordinances, policies and standards to which they were subject, this legislative objective would be frustrated. We thus conclude the statute requires prior notice, either actual or constructive, as a condition to imposing ordinances, policies and standards upon an applicant who is entitled to rely on a complete vesting tentative map. An ordinance, policy or standard of a public agency which is written and accessible is reasonably calculated to apprise interested parties of their responsibilities and would suffice to supply constructive notice.[14]

■ City implicitly acknowledges plaintiff cannot be bound by a "policy" of which it had no actual or constructive notice by arguing that plaintiff had actual notice of City's "decade-old" undergrounding requirement. Indeed, the trial court so found. However, the evidence does not support the court's finding. It consists of a single sentence in the transcript of a development review commission meeting held in May 1989. At that meeting, an employee from City's utilities department, responding to another employee's suggestion that plaintiff would be required to underground utilities, states, "You're trying to get [plaintiff] to get PG&E and telephone —and all that stuff undergrounded before he starts work?" First, there is no indication in the transcript whether the discussion involved on-site or off-site undergrounding. Second, even if the discussion was about off-site undergrounding, the comment suggests City is "trying to get" plaintiff to underground utilities. There is no mention of any existing ordinance, policy or standard. If anything, the inference suggested by the transcript is that there was no such ordinance, policy or standard then in existence.

---

[14]While Government Code section 66474.2, subdivision (a) does not expressly require an ordinance, policy or standard to be in writing, it strongly implies as much. Subdivision (b) of that section permits a local agency under narrowly defined circumstances to condition approval of an application for a tentative map upon an ordinance, policy or standard which was *not* in effect when the application was deemed complete. This exception to the general rule of subdivision (a) obtains only where the ordinance, policy or standard was in effect on the date the agency *approved* the tentative map *and* it was enacted or instituted as a result of proceedings initiated *before* the application was deemed complete. Furthermore, these proceedings must have been initiated by way of "ordinance, resolution, or motion" and the agency must have "[p]ublished notice . . . containing a description sufficient to notify the public of the nature of the proposed change in the applicable general or specific plans, or zoning or subdivision ordinances." In addition to published notice of a proposed ordinance, policy or standard, the requirement that the agency initiate the proposal by "ordinance, resolution, or motion" clearly contemplates that the proposal will at least be spread upon the written record of the agency's formal proceedings.

City argues the preamble to Resolution No. 90-484, which added section 3.13 to the Design Standards and amended section 306 of the Standard Specifications, states the Resolution was enacted to "clarify and memorialize" City's existing undergrounding policy. City claims the preamble "provides persuasive evidence of [City's] pre-existing (undergrounding) policy . . . ."

Assuming Resolution No. 90-484 was intended after the fact to memorialize a preexisting policy, the question remains whether plaintiff had actual or constructive notice of that policy before its vesting tentative map application was deemed complete. As the Legislature has made clear, the private sector must be able to rely on the stability and certainty of local agency ordinances, policies and standards. (See Gov. Code, § 66498.9.) Quite obviously one cannot rely on what one does not know or cannot reasonably discover. At best, the addition of section 3.13 to the Design Standards in December 1990 suggests that prior thereto City had no ordinance, policy or standard requiring developers to underground existing off-site utilities, but simply an unwritten, informal practice which resided and thus could be found only in the minds of City employees.

## VI

■ Finally, City argues it has the statutory authority to apply section 3.13 of the Design Standards retroactively to plaintiff. Government Code section 66498.1, subdivision (c)(1) provides a local agency may apply policies and standards which were not in effect before a vesting tentative map application was deemed complete if the condition promotes the health and safety of the local agency's residents: "[A local agency may] condition or deny a permit, approval, extension or entitlement if it determines . . . . [¶] (1) A failure to do so would place the residents of the subdivision or the immediate community, or both, in a condition dangerous to their health and safety, or both."

Relying solely on the declarations submitted by City, the trial court found Resolution No. 90-484 was based on promoting the public health, safety and welfare of the residents of Tracy. As we have noted, the declarations are entitled to little weight and futhermore, cannot substitute for a determination by City of a condition dangerous to health and safety as required by Government Code section 66498.1, subdivision (c)(1). There is nothing in the record which suggests that at any time during the administrative process City made the requisite health and safety finding. Certainly, no such finding

is included in Resolution No. 90-484. In the absence of any such finding, City's claim must be rejected.[15]

 As of the time plaintiff's vesting tentative map application was deemed complete, City did not have "in effect" an ordinance, policy or standard requiring plaintiff at its own expense to underground existing off-site utilities fronting the development. Even if it did, plaintiff had no notice or reasonable means of acquiring notice of it before its application was deemed complete. Accordingly, City's action in imposing the off-site undergrounding requirement on plaintiff was "so palpably unreasonable and arbitrary as to indicate an abuse of discretion as a matter of law." (*City & County of S. F. v. Boyd* (1943) 22 Cal.2d 685, 690 [140 P.2d 666].)

The judgment is reversed and the matter remanded to the trial court with directions to enter judgment issuing a writ of mandate directing City to approve nunc pro tunc August 9, 1989, plaintiff's vesting tentative map application without requiring plaintiff to underground off-site utilities and declaring invalid as to plaintiff City's imposition of the requirement that plaintiff place off-site utilities underground.

Blease, J., and Davis, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 10, 1994.

---

[15]In its finding No. 2, the trial court stated: "The purpose of [City's] Undergrounding Policy is to protect the public's health, safety and welfare." As we have noted, no such language can be found in Resolution No. 90-484. Such language first appears in the trial court declaration of Michael McCluskey, the City's director of public works. McCluskey avers in relevant part: "The purpose underlying the Undergrounding Policy is twofold. First, the overall health[,] safety and welfare of Tracy citizens is promoted by underground utilities. . . . Second, Tracy believes that overhead utilities are not particularly pleasing to the eye."