[No. S129125. Dec. 21, 2006.]

CITY OF GOLETA et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA BARBARA COUNTY, Respondent;
OLY CHADMAR SANDPIPER GENERAL PARTNERSHIP, Real Party in
Interest.

272

COUNSEL

Julie Hayward Biggs, City Attorney; Burke, Williams & Sorensen, Brian A. Pierik, Geralyn L. Skapik, Amy E. Morgan; Shute, Mihaly & Weinberger, Rachel Hooper and Ellison Folk for Petitioners.

Meyers, Nave, Ribak, Silver & Wilson, Peter S. Hayes, Amrit S. Kulkami and Kyle W. LaLonde for League of California Cities and City of Laguna Woods as Amici Curiae on behalf of Petitioners.

Moscone, Emblidge & Quadra, G. Scott Emblidge and Rachel J. Sater for Carmel Valley Association as Amicus Curiae on behalf of Petitioners.

Law Offices of Donald B. Mooney and Donald B. Mooney for Sierra Club, Surfrider Foundation and Santa Barbara Shores Homeowner's Association as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Allen Matkins Leck Gamble & Mallory, Patrick E. Breen, Anthony J. Oliva, Patrick A. Perry; Hollister & Brace, Richard C. Monk, Marcus Bird; Lascher & Lascher and Wendy C. Lascher for Real Party in Interest.

June Babiracki Barlow and Grant Michiaki Habata for California Association of Realtors as Amicus Curiae on behalf of Real Party in Interest.

Stoel Rives and James P. Corn for Consulting Engineers and Land Surveyors of California as Amicus Curiae on behalf of Real Party in Interest.

Stephen Shane Stark, County Counsel (Santa Barbara), Alan L. Seltzer, Chief Assistant County Counsel, and Kelly A. Casillas, Deputy County Counsel, as Amici Curiae on behalf of Real Party in Interest.

California Rural Legal Assistance and Kirk Ah-Tye for Kathryn Lubahn as Amicus Curiae on behalf of Real Party in Interest.

James S. Burling for Pacific Legal Foundation as Amicus Curiae on behalf of Real Party in Interest.

Hill & Trager and Russell R. Ruiz for Goleta Water District as Amicus Curiae on behalf of Real Party in Interest.

Richard Kelton for Bollenbacher & Kelton, Inc., as Amicus Curiae on behalf of Real Party in Interest.

Reetz, Fox & Bartlett and Randall Fox for Coalition of Labor, Agriculture and Business as Amicus Curiae on behalf of Real Party in Interest.

Nick Cammarota for California Building Industry Association and California Land Surveyors Association as Amici Curiae on behalf of Real Party in Interest.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Denise Ferkich Hoffman, Deputy Attorney General, for Department of Housing and Community Development as Amicus Curiae on behalf of Real Party in Interest.

OPINION

**CORRIGAN, J.**—Here we conclude that a newly incorporated city had discretion to disapprove a final subdivision map when the vesting tentative subdivision map had been approved by the county. We also conclude that actions taken by the city did not divest it of this discretion or subject it to estoppel.

## I.  FACTS AND PROCEDURAL BACKGROUND

The City of Goleta (Goleta or City) was created from unincorporated territory within the County of Santa Barbara (County). After the incorporation process began, Oly Chadmar Sandpiper General Partnership (Sandpiper) submitted a vesting tentative subdivision map to the County for a multiunit residential project within Goleta's proposed boundaries. The County approved the vesting tentative map after Goleta's incorporation was approved by the electorate on November 6, 2001. The sequence of these events is significant because it bears on whether Sandpiper qualified for the safe harbor provision of Government Code section 66413.5, subdivision (f).[1] (See, *post*, at pp. 276–278.)

When the incorporation became effective on February 1, 2002, the newly empowered City Council of Goleta (City Council) adopted the County ordinances. A newly created city is required to "adopt an ordinance providing that all county ordinances previously applicable shall remain in full force and effect as city ordinances for a period of 120 days after incorporation, or until the city council has enacted ordinances superseding the county ordinances, whichever occurs first." (§ 57376, subd. (a).)

The manner in which the City Council undertook its action is central to this litigation. The resolution adopting the County ordinances replaced references to the County and its board of supervisors with references to the City and its City Council. (Goleta Ord. No. 02-01.) The parties disagree as to whether, in taking this action, the City bound itself to approve Sandpiper's final map. The gist of Sandpiper's argument is that, while Goleta would otherwise have had discretion under section 66413.5 to reject Sandpiper's final map application, it divested itself of that discretion by adopting the County ordinances in a way that placed the City Council in the shoes of the

---

[1] Undesignated statutory references are to the Government Code.

Board of Supervisors. Thus, Sandpiper argues, the City was bound to give its ministerial approval, just as the County would have been.

The following facts bear on the estoppel claim. On November 28, 2001, three weeks after the incorporation election, Goleta's mayor-elect wrote to the County Board of Supervisors expressing the City-Council-elect's concerns about the Sandpiper project. On January 15, 2002, the Board of Supervisors approved the vesting tentative map. On March 18, 2002, a City consultant notified a County planning staff member that the City Council wished to be consulted before the County made any other decisions affecting the project. On June 4, 2002, the interim city attorney informed the same County staff member that the City's concerns were both jurisdictional and substantive. The City states, and Sandpiper does not deny, that Sandpiper was informed of these communications.

On May 13, 2002, the County approved a coastal development permit for the project. Three weeks later the City challenged that approval before the California Coastal Commission. In its letter of appeal, the City stated it had discretion under section 66413.5 to deny Sandpiper's final map.[2]

At several regularly scheduled meetings between August and November 2002, the City Council reviewed Sandpiper's plan and identified a significant number of concerns.

On November 26, 2002, the city surveyor wrote the city engineer that Sandpiper's final map was "technically correct." The City does not dispute that the final map was in "substantial compliance" with the vesting tentative map. However, on January 6, 2003, the City Council denied approval of Sandpiper's final map, concluding that the project's design and improvements would be inconsistent in specified respects with the general plan being prepared by the City.[3]

The trial court granted Sandpiper's writ petition and ordered the City to approve the final map. The Court of Appeal reversed the order by writ of mandate.

We affirm the judgment of the Court of Appeal.

---

[2] The Coastal Commission ultimately decided not to determine the substantive merits of the appeal.

[3] Section 65360 provides in pertinent part: "The legislative body of a newly incorporated city or newly formed county shall adopt a general plan within 30 months following incorporation or formation. During that 30-month period of time, the city or county is not subject to the requirement that a general plan be adopted or the requirements of state law that its decisions be consistent with the general plan, if [specified conditions] are met."

## II. DISCUSSION

■ The Subdivision Map Act (Act) gives local agencies authority to regulate subdivision development within their boundaries. (§ 66411.) The agencies exercise their authority by reviewing maps of a proposed subdivision. A tentative map must, among other things, be consistent with either the general local plan or an existing specific plan. (§§ 66473.5, 66474.) Generally, a final map must be approved if it substantially complies with a previously approved tentative map (§ 66474.1) and meets the requirements applicable to the subdivision when the tentative map was approved (§ 66473).

"The Subdivision Map Act (Act) permits a subdivider to file a 'vesting tentative map' whenever the Act requires a tentative map. This procedure is intended to provide greater statutory protection to subdividers than was afforded under the common law vested rights doctrine. [Citations.]" (*Bright Development v. City of Tracy* (1993) 20 Cal.App.4th 783, 792 [24 Cal.Rptr.2d 618].) This case does not turn on the fact that Sandpiper filed a *vesting* tentative map.

### A.  Section 66413.5

Before enactment of section 66413.5 (Stats. 1988, ch. 1330, § 1, pp. 4396–4398), it was unclear whether a newly incorporated city had discretion to disapprove a final map when the tentative map had been approved by the county. The Attorney General found no case law squarely on point, but concluded a city did *not* have such discretion. (*Approval of Tentative Subdivision Map*, 63 Ops.Cal.Atty.Gen. 844 (1980).) The Legislative Counsel reached the same conclusion. (Ops. Cal. Legis. Counsel, No. 15919 (July 15, 1985) Vesting Tentative Maps: Incorporation or Annexation, p. 1.)

■ By enacting subdivision (a) of section 66413.5 the Legislature specifically provided that a newly incorporated city must approve a final map where the tentative map has been approved by the county and the final map meets all of the conditions of the tentative map and the requirements of the Act.[4]

However, subdivision (a) of section 66413.5 is qualified by subdivision (f) of the same section. Under subdivision (f), the new city is only compelled to

---

[4] Section 66413.5, subdivision (a) now provides: "When any area in a subdivision or proposed subdivision as to which a tentative map meeting the criteria of this section has been approved by a board of supervisors is incorporated into a newly incorporated city, the newly incorporated city shall approve the final map if it meets all of the conditions of the tentative map and meets the requirements and conditions for approval of final maps as provided in Article 4 (commencing with Section 66456), and other requirements of this division."

approve a final map if two temporal conditions are met: (1) the application for the tentative map or vesting tentative map was submitted before the first signature was placed on the incorporation petition; and (2) the county approved the tentative map before the incorporation election.[5]

The original legislation had no time constraints. (Sen. Bill No. 186 (1987–1988 Reg. Sess.) as introduced Jan. 16, 1987.) However, the Legislature came to recognize that the prospect of an incorporation often resulted in a "run" on development rights. To prevent such "runs," the bill was amended to incorporate the temporal conditions set out in section 66413.5, subdivision (f). (See, e.g., Sen. Com. on Local Gov., 3d reading analysis of Sen. Bill No. 186 (1987–1988 Reg. Sess.) as amended Aug. 10, 1988.)

The trial court correctly found that the vesting tentative map here did not satisfy either of section 66413.5, subdivision (f)'s temporal conditions. Therefore, as Sandpiper concedes, the mandatory approval obligation of subdivision (a) does not apply.

The Court of Appeal agreed with the City that, under these circumstances, "the plain language of section 66413.5 gives the City discretion to deny Sandpiper's final map." Sandpiper does not dispute that conclusion.[6] However, it contends that Goleta was, nevertheless, required to approve its final map. It argues the City surrendered its statutory discretion by adopting a County ordinance that provided for ministerial approval of a final map that conforms with an approved tentative map.

---

[5] Section 66413.5, subdivision (f) now provides: "Except as otherwise provided in subdivision (g), this section applies to any approved tentative map or approved vesting tentative map that meets both of the following requirements:

"(1) The application for the tentative map or the vesting tentative map is submitted prior to the date that the first signature was affixed to the petition for incorporation pursuant to Section 56704, regardless of the validity of the first signature, or the adoption of the resolution pursuant to Section 56800, whichever occurs first.

"(2) The county approved the tentative map or the vesting tentative map prior to the date of the election on the question of incorporation."

Subdivision (g) of section 66413.5 is not applicable here. It provides: "This section does not apply to any territory for which the effective date of the incorporation is prior to January 1, 1999." Goleta's incorporation became effective on February 1, 2002.

[6] The California Department of Housing and Community Development filed an amicus curiae brief supporting Sandpiper. It contends that a new city has discretion to deny a final map when section 66413.5, subdivision (f)'s temporal conditions have not been satisfied, *but only if the new city has enacted an ordinance governing the exercise of such discretion.* We agree with the Court of Appeal. "There is nothing in section 66413.5 requiring the City to adopt legislation to implement the statute. It is not the court's prerogative to add what the Legislature has omitted. [Citation.]"

In its amicus curiae brief, the Pacific Legal Foundation argues that development rights should not be "abrogated by a change in governmental structure." In enacting section 66413.5, the Legislature gave a nuanced answer to this assertion, and we are not free to disregard it.

## B. The Effect of Goleta's Ordinances

As noted (*ante*, at p. 274), in compliance with section 57376, subdivision (a), the Goleta City Council adopted the County's subdivision ordinances. The resolution adopting the County ordinances substituted references to the City and its City Council for references to the County and its Board of Supervisors. (Goleta Ord. No. 02-01.) The parties disagree on the substitutions' legal effect.

Sandpiper contends Goleta was obliged by section 21-10 of its adopted ordinances to give ministerial approval to the final map. Goleta Municipal Code section 21-10 read in pertinent part: "When the [City] Surveyor is satisfied that the map is technically correct, conforms to the approved tentative map or any approved alterations thereof and complies with all applicable laws and regulations, the [City] Surveyor will notify in writing the licensed land surveyor . . . who prepared the map and request delivery of the original tracing of the final or parcel map. . . . In the case of a final map . . . the [City] Surveyor will transmit the same to the Clerk of the [City Council] for filing and approval. The [City Council] *shall* approve the map at its next regular meeting if it conforms with all the requirements of applicable laws and regulations made thereunder." (Italics added.)

■ Goleta responds that when section 21-10 of its Municipal Code is read in light of section 21-6, it is clear that the City was obligated to grant ministerial approval to final maps only when it, not the County, had given initial approval to the tentative map. Section 21-6, subdivision (b) identifies the City Council as the decision maker for all tentative maps submitted to the City for land use projects within the City's jurisdiction.[7] Section 21-6, subdivision (m) provides that the decision maker, i.e., the City Council, shall approve, conditionally approve, or disapprove all tentative and final maps.[8]

Sandpiper labels Goleta's position "nonsensical." It states its argument as follows. The City's theory "would require a finding that after February 1, 2002, when the City adopted all [of the] County's Ordinances and inserted the name change, there no longer was a vesting tentative map as defined in the City's [Subdivision Map Act] ordinances. [¶] The City's own actions

---

[7] Section 21-6, subdivision (b) provides: "The [City Council] shall be the decision-maker for all Final Maps bearing the [City] Surveyor's statement [and] all tentative maps including tentative parcel maps which are companion to other discretionary cases under the approval jurisdiction of the [City Council] . . . ."

[8] Section 21-6, subdivision (m) provides: "The decision-maker shall approve, conditionally approve, or disapprove the subdivision map, both tentative and final and parcel maps . . . within the time allowed by the applicable provisions of the California Government Code . . . or within any additional time agreed to by the subdivider."

belie its reasoning. The City's Resolution concerning the Project . . . states, 'The City Surveyor notified the City Engineer of the City of Goleta by letter dated November 26, 2002, that the proposed Final Map for the Sandpiper Project was technically correct, consistent with the requirements of the Subdivision Map Act, and ready for filing with the City Council.' If the vesting tentative map had never been approved by an authorized entity, then the final map arising from it was not consistent with the Subdivision Map Act and not ready for filing with the City."

■ Sandpiper's characterization of the City's position is overbroad. Sections 21-6 and 21-10 can be reconciled as stating the City's intention to retain discretion over final maps when the County approved the tentative maps, but to defer to the general rule of ministerial approval for final maps when the City, itself, has approved the tentative maps.

■ We conclude the City had discretion under section 66413.5 to disapprove the final map because it had not approved the tentative map.

## C. Estoppel

Sandpiper contends in the alternative that the City was estopped from disapproving the final map.

■ "The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 488–489 [91 Cal.Rptr. 23, 476 P.2d 423].)" (*Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264]; see *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 794 [72 Cal.Rptr.2d 624, 952 P.2d 641] (*Hughes*).)

■ Equitable estoppel "will not apply against a governmental body except in unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy. (*Bib'le v. Committee of Bar Examiners* (1980) 26 Cal.3d 548, 553 [162 Cal.Rptr. 426, 606 P.2d 733]; *Hock Investment Co. v. City and County of San Francisco* (1989) 215 Cal.App.3d 438, 449 [263 Cal.Rptr. 665].)" (*Hughes, supra,* 17 Cal.4th at p. 793.)

Sandpiper has not established the elements of estoppel against a private party, much less against a governmental body. As the Court of Appeal observed, "There is no evidence in the record that any official, employee or agent of the City made any express representation that the City would approve the map. To the contrary, the undisputed evidence shows that City officials publicly voiced their concerns about the project both before and after the incorporation became effective."

City authorities began voicing concerns about the project from virtually the moment of the City's creation. The City-Council-elect informed the County Board of Supervisors of its reservations in November of 2001. After the County approved the vesting tentative map, City representatives continued to voice concerns in March and June of 2002. The City appealed the County's grant of a coastal development permit, and during the appellate process, asserted the City's discretion to withhold final map approval.[9] The City Council continued to identify problems with Sandpiper's plan at its meetings in August through November of 2002. In light of this history, the City's decision to disapprove the final map should not have come as a surprise to Sandpiper.

Sandpiper contends that Goleta's adoption of the County subdivision ordinances created a reasonable expectation on Sandpiper's part that its final map would receive ministerial approval. We conclude above that the City's action did not entail this result. (See, *ante*, at pp. 278–279.) Therefore, this lynchpin of Sandpiper's estoppel argument fails.

Sandpiper also claims it relied on the fact that Goleta exempted its project when it extended a moratorium on development. On February 11, 2002, Goleta adopted an ordinance placing a 45-day moratorium on approval of development proposals. On March 25, 2002, the City extended the moratorium for the 10 months and 15 days permitted under section 65858, subdivision (a). As a multifamily housing project, the Sandpiper proposal was exempted from the moratorium extension by operation of law. The City did not make the finding required by section 65858, subdivision (c) that continued approval of the project would have a "specific, adverse impact upon the

---

[9] When the County was considering the vesting tentative map, county counsel advised the board of supervisors that any approval would not occur in time for Sandpiper to qualify for section 66413.5's safe harbor provision.

public health or safety."[10] Exempting the project from the extended moratorium in this fashion could not reasonably be understood to imply that it would eventually receive approval.

■ Finally, Sandpiper claims it relied on the fact that the City "worked extensively with [Sandpiper] to clear the County-imposed conditions from the vesting tentative map at considerable expense to [Sandpiper]." However, as the Court of Appeal held, estoppel may not be based on expenditures made before a building permit or its functional equivalent has issued. (*Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1269–1270 [2 Cal.Rptr.3d 739].)

## III. DISPOSITION

We affirm the judgment of the Court of Appeal.[11]

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**KENNARD, J.,** Dissenting.—I dissent for the reasons given below.

The majority opinion has three holdings: First, it concludes that under Government Code section 66413.5[1] the developer here was not entitled to approval of its final subdivision map because its application for a vesting

---

[10] The exemption policy set out in Goleta Ordinance No. 02-15 provided in pertinent part: "Development projects for which no extension of the 45-day moratorium imposed by Ordinance No. 02-13 is permitted under the provisions of California Government Code Section 65858(c)(1)."

Section 65858, subdivision (c) provides in pertinent part: "[A]ny interim ordinance adopted pursuant to this section that has the effect of denying approvals needed for the development of projects with a significant component of multifamily housing may not be extended except upon written findings adopted by the legislative body, supported by substantial evidence on the record, that all of the following conditions exist:

"(1) The continued approval of the development of multifamily housing projects would have a specific, adverse impact upon the public health or safety. As used in this paragraph, a 'specific, adverse impact' means a significant, quantifiable, direct, and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date that the ordinance is adopted by the legislative body.

"(2) The interim ordinance is necessary to mitigate or avoid the specific, adverse impact identified pursuant to paragraph (1).

"(3) There is no feasible alternative to satisfactorily mitigate or avoid the specific, adverse impact identified pursuant to paragraph (1) as well or better, with a less burdensome or restrictive effect, than the adoption of the proposed interim ordinance."

[11] Four requests for judicial notice were filed. (1) The request by Sandpiper filed March 15, 2005, is denied. (2) The request by the City filed April 22, 2005, is granted. (3) The request by amicus curiae Coalition of Labor, Agriculture, and Business filed June 7, 2005, is denied. (4) The request by the City filed June 30, 2005, is denied.

[1] All further statutory references are to the Government Code.

tentative subdivision map was not made within the statutory time constraints. The developer, however, conceded this point in its opening brief to this court, as it did below. Accordingly, the majority's holding pertaining to section 66413.5 is irrelevant to a resolution of this case.

Second, the majority holds that the city in question is not equitably estopped by its conduct—participation in and encouragement of the developer's efforts to clear conditions imposed on the tentative map—from withholding final subdivision map approval. Because of my conclusion that the city was required under section 66474.1 to approve the developer's final map, I need not reach the estoppel issue.

Third, the majority concludes that the city, after its incorporation and notwithstanding its adoption and readoption of the county's land use regulations, retained discretion to withhold ministerial approval of the developer's final subdivision map. I disagree. In my view, the city lacked such discretion.

## I.

The property in dispute consists of 14.46 acres within the coastal zone of the County of Santa Barbara (County). In 1993, the County adopted the Goleta Community Plan, which designated the parcel as lying within an affordable housing zone. Two years later, the County approved development of the site with 105 residential units, half of them affordable housing. The County prepared and certified a final environmental impact report for the proposed development. The proposed development, however, was never built.

In June 1999, Oly Chadmar Sandpiper General Partnership (Sandpiper) bought the parcel. On July 4, 1999, a petition to incorporate Goleta as a city received its first signature.

On November 18, 1999, Sandpiper submitted to the County its vesting tentative map application calling for construction of 109 residential units, with 20 percent affordable housing. The County deemed the map application complete on January 1, 2000.

On November 6, 2001, voters residing within the boundaries of the proposed city passed a measure to incorporate Goleta.

On January 15, 2002, the County board of supervisors approved Sandpiper's development plan and its vesting tentative map for the 109-unit project.

On February 1, 2002, Goleta's incorporation as a city took effect. Under section 57376, the County's subdivision ordinances automatically became the

city's subdivision ordinances for 120 days. The city council did not adopt superseding ordinances, and the only textual change it made to the county ordinances was to substitute "City of Goleta" for "County of Santa Barbara" and "City Council" for "Board of Supervisors." Ten days later, the City of Goleta imposed a 45-day moratorium on approvals of all developments, including this one. Thereafter, the City of Goleta, on March 25, 2002, exempted Sandpiper from the moratorium because its project included affordable housing and based on a finding that the project posed no threat to public health, safety or welfare. (§ 65858, subd. (c)(1).)

In June 2002, after the statutory 120 days had elapsed and the City of Goleta had not enacted its own subdivision ordinances superseding those of the County, it readopted the County's subdivision ordinances without change. (§ 57376.) In November 2002, a County employee acting as the city's agent submitted Sandpiper's final subdivision map to the Goleta City Council for its approval, having found the map to be technically correct and consistent with the city's subdivision ordinance, which provided that the city "shall approve the map at its next regular meeting." The city council held four regular meetings, and then denied final map approval on January 6, 2003. Its resolution denying final map approval stated, "There is not a reasonable probability that the project will be consistent with the [city's] general plan," then still in preparation.

## II.

The issue presented is simple: Did the newly incorporated City of Goleta have discretion to deny approval of the developer's final subdivision map that substantially complied with a tentative vesting map previously approved by the County? The answer is "No."

In 1998, the Legislature enacted section 66413.5, as part of the Subdivision Map Act (§ 66410 et seq.; Map Act), in response to uncertainty as to what rights were retained by a developer who had obtained county approval of a tentative vesting subdivision map once the acreage of the proposed subdivision became part of a newly incorporated city. (Off. of Local Gov. Affairs, Enrolled Bill Rep. on Sen. Bill No. 186 (1987–1988 Reg. Sess.) Aug. 24, 1988, p. 3; Sen. Coms. on Local Gov. and Housing & Urban Affairs, Joint Hearing Rep. on New Cities and Land Use (Nov. 1987) Background, pp. 24–25.) In 1980, an Attorney General's opinion had concluded that under general provisions of the Map Act a new city's approval of a final conforming map was a purely ministerial duty. (63 Ops.Cal.Atty.Gen. 844, 848 (1980).) In 1985, the Legislative Analyst reached a similar conclusion (Legis. Analyst, Vesting Tentative Maps: Incorporation or Annexation, Opn. No. 15919 (July 15, 1985) p. 8), in an analysis prepared for Senator Joseph

Montoya, who later authored the bill that became section 66413.5. (Sen. Bill No. 186 (1987–1988 Reg. Sess.) § 1.)

Section 66413.5, as signed into law, only partially addresses the approval duty a newly incorporated city has as to tentative vesting maps approved by the county before the city's incorporation. Under that statute, when the county has approved a tentative vesting map both *before* a petition to incorporate a new city receives its first signature and *before* an incorporation election has been held, the newly incorporated city must approve a final conforming map. Section 66413.5 thus provides a so-called safe harbor for only those projects receiving county approval within a limited timeframe. Notably the Legislature did not expressly state what incorporation meant for projects falling outside the safe harbor of section 66413.5. (See § 66413 [on annexation to a city of area included in a tentative vesting map that has not yet received county's final map approval, "all procedures and regulations . . . of the annexing city shall be deemed to commence as of the effective date of the annexation"].) Therefore, section 66413.5 is irrelevant here, as the developer has consistently maintained.

The majority reasons that because Sandpiper does not come within the safe harbor created by section 66413.5, Goleta, once its incorporation took effect, had absolute discretion to deny approval of Sandpiper's final map even though the final map conformed to its county-approved tentative vesting map. The majority reaches that result by relying on the County's subdivision ordinances as adopted by the City of Goleta. I read section 66474.1 to control the application of those ordinances.

In language that could not be any clearer, section 66474.1 states: "A legislative body shall not deny approval" of a final subdivision map "if it has previously approved a tentative map for the proposed subdivision and if it finds" the final map "is in substantial compliance with the previously approved tentative map." When all the conditions pertaining to the tentative map have been met, approval of the final map is a purely ministerial duty. (*Youngblood v. Board of Supervisors* (1978) 22 Cal.3d 644, 648 [150 Cal.Rptr. 242, 586 P.2d 556] (*Youngblood*); *Great Western Sav. & Loan Assn. v. City of Los Angeles* (1973) 31 Cal.App.3d 403, 410 [107 Cal.Rptr. 359] ["governing body's function is administrative, ministerial and mandatory where the final tract map" complies with local laws and conditions imposed on tentative map].) In *Youngblood,* "we held that a county lacked discretion under the Map Act to deny a final subdivision map if the application showed the development substantially conformed to the tentative map and *its attendant* conditions." (*City of West Hollywood v. Beverly Towers, Inc.* (1991) 52 Cal.3d 1184, 1190–1191 [278 Cal.Rptr. 375, 805 P.2d 329].) The rationale underlying the statutory scheme at issue is that once a "tentative map is approved,

the developer often must expend substantial sums to comply with the conditions attached to that approval," which "will result in the construction of improvements consistent with the proposed subdivision, but often inconsistent with alternative uses of the land." (*Youngblood, supra,* 22 Cal.3d at p. 655.)

The majority here concludes that because it was *the County*, acting through its *board of supervisors*, that approved Sandpiper's tentative subdivision map, Goleta's city council is not subject to section 66474.1's mandate that "the legislative body" may not deny approval of a final map "if it has previously approved a tentative map for the proposed subdivision." (See maj. opn., *ante,* at pp. 278–279.) The majority's conclusion might have force had the City of Goleta not put itself in the shoes of the County by adopting and readopting the County's subdivision regulations as its very own, a point I discuss in detail below.

A newly incorporated city that comprises formerly unincorporated land is required by statute, "immediately following its organization and prior to performing any other official act, [to] adopt an ordinance providing that all county ordinances previously applicable shall remain in full force and effect as city ordinances for . . . 120 days after incorporation, or until the city council has enacted ordinances superseding the county ordinances." (§ 57376.) California's Map Act permits local ordinances to supplement its statutory procedures. "Of course, if a local ordinance supplements procedures in the Map Act, and does not conflict with them, the local ordinance does not 'modify' the Map Act." (*Griffis v. County of Mono* (1985) 163 Cal.App.3d 414, 425, fn. 14 [209 Cal.Rptr. 519], italics omitted.) Here Goleta, by operation of state law, adopted the County's subdivision ordinances as its very own the day after its incorporation as a city took effect. Four months later, Goleta readopted the County's subdivision ordinances. When Goleta denied approval of Sandpiper's final, conforming subdivision map on January 6, 2003, some 11 months after Goleta's incorporation took effect, it had not enacted subdivision ordinances of its own, as it could have (§ 57376), either to supersede those it took over from the County or to supplement the state law procedural requirements imposed by the Map Act.

Nor did the City of Goleta seek to avail itself of an urgency provision in the Map Act permitting a local public entity that has approved a vesting tentative map to "condition or deny" final approval on findings that "[a] failure to do so would place the residents of the subdivision or the immediate community, or both, in a condition *dangerous* to their health or safety." (§ 66498.1, subd. (c)(1), italics added.)

Only on January 6, 2003, when the City of Goleta denied approval of Sandpiper's final subdivision map, did the city council give a nod to this

urgency provision, citing the project's potential inconsistency with Goleta's "future general plan." Such potential inconsistency, the council concluded, "would be detrimental to the health, safety, and general welfare of the City of Goleta." But a mere assertion of detriment does not comply with the urgency provision's requirement of danger to the health or safety of the residents of the subdivision or the community. Moreover, Goleta's concern about detriment to the health and safety of its residents was a complete "about-face." Nine and a half months earlier, on March 25, 2002, when the City of Goleta exempted Sandpiper's project from the moratorium on development approvals, the city had concluded that the project posed *no* threat to public health, safety or welfare.

For the reasons stated above, I would reverse the judgment of the Court of Appeal.