Filed 7/28/14  Marriage of Goodman CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of LOREN E. and TIMOTHY GOODMAN. | H039788 (Santa Cruz County Super. Ct. No. FL011618) |
| LOREN E. GOODMAN, Respondent, v. TIMOTHY GOODMAN, Appellant. | |

## I.  INTRODUCTION

Pursuant to a 2003 stipulation and order, appellant Timothy Goodman was obligated to pay respondent Loren Goodman[1] spousal support, subject to a step down in the amount of support based on real estate commissions that Loren received.  Loren initially calculated the step down in support by using her gross commissions.  By 2005, she began using her net commissions to calculate the step down, which resulted in Timothy being obligated to pay a greater amount of support.  In 2012, Timothy filed a request with the trial court to determine the amount of overpayment of spousal support,

---

[1] For clarity and convenience, we will refer to Timothy Goodman and Loren Goodman by their first names.

on the ground that Loren was required under the parties' original 2003 stipulation and order to use gross commissions rather than net commissions to calculate the step down in support. The court determined that Timothy was equitably estopped from seeking recalculation of prior step down amounts based on Loren's gross commissions, and that he was also barred going forward from seeking step down calculations based on Loren's gross commissions.

On appeal, Timothy contends that the trial court erred by not using the clear and convincing burden of proof in determining whether the doctrine of equitable estoppel applied, and that the elements of equitable estoppel were not met in this case.

For the reasons stated below, we conclude that Loren failed to establish that equitable estoppel applied in this case, and therefore we will reverse the trial court's order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The 2003 Stipulation and Order Regarding Spousal Support*

In November 2003, a stipulation by the parties and order by the trial court was filed regarding permanent spousal support. The stipulation and order provides that effective September 1, 2003, Timothy will pay Loren $1,200 per month for spousal support until the death of either party or further order of the court.

The stipulation and order also provides for a "step down in Spousal Support" calculated as follows:

"a) Every six months, [Loren] shall provide to [Timothy] and/or his attorney a copy of all her Real Estate Commissions received. The commissions shall be averaged over the six month period and if the monthly average exceeds more than $1,500.00 per month, Spousal Support paid by [Timothy] to [Loren] shall be reduced by one-half (1/2) of any said increase (e.g. if [Loren's] commissions added to an average of $1,600.00 per month, there would be a $100.00 per month over the $1,500.00 limit, Spousal Support would then be reduced by one-half of that sum of the sum of $50.00 in this example).

2

"b)     In the event that there is an overpayment of Spousal Support [an] adjustment shall be made to future spousal support payable by [Timothy] to [Loren] in that remaining balance of spousal support shall be reduced on [a] monthly basis not to exceed three months to reimburse [Timothy's] overpayment in full."

The order was signed by Loren, Timothy, their respective counsel, and the trial court, the Honorable Samuel S. Stevens.

**B.  *The April 2012 Order Regarding the Meaning of "Commissions"***

In April 2012, the trial court, the Honorable Jeff Almquist, denied a motion by Timothy to modify spousal support based on a purported change in circumstances, and awarded attorney's fees to Loren.  The order also states:  "The Court denies [Loren's] request to re-define the stepdown provision of the parties' 2003 Stipulation and Order so as to mean 'net commisions' as opposed to 'gross commissions.' "

**C.  *Timothy's Request to Determine Overpayment of Support***

In September 2012, Timothy filed a request to "[d]etermine overpayment of spousal support and monies owing" by Loren.  In the request, Timothy stated that Loren had previously "requested that the court 'clarify' the [2003] Order to redefine the stepdown provision so as to mean that there would be a reduction in support based on the 'net commissions earned by [Loren]' rather than the gross commissions as intended by the parties."  Timothy stated that the court had denied Loren's request to clarify or redefine the order, and that the 2003 stipulation "remains in effect."

Timothy asserted that in 2005, Loren "on her own, and without [his] consent," began using net commissions instead of gross commissions for the step down on spousal support.  Timothy asserted that "[t]his created an over payment of spousal support by [him]."

**D.  *Loren's Response Regarding Overpayment of Support***

In a responsive declaration, Loren stated that under the original 2003 stipulation and order, she "paid the first Stepdown adjustment (September 03 through February 04)

3

based on . . . gross revenues." However, her boss indicated "this was likely not correct." The issue had come up because Loren was "relatively new to being self-employed, and when [she] entered into the 2003 Stipulation [she] was not entirely familiar with how much [her] business expenses would be." She thereafter asked the attorney who had represented her at the time the 2003 stipulation and order was filed, and the attorney told her to use net commissions, not gross commissions. Loren stated that after receiving her attorney's advice, she "began calculating the step-down adjustment" based on net commissions.

According to Loren, she told Timothy about the change in calculations, they had multiple communications about the issue, and he never objected to the calculations. She also informed Timothy that she was using their former accountant to determine her proper business deductions.

Loren believed that Timothy's request was "retaliatory in nature," and that he was "seeking redress, after all these years" because his motion for modification of spousal support had been denied. She stated that it "would create a great hardship" for her if Timothy recovered "past stepdown adjustments." Loren further stated that she believed the trial court's April 2012 order, which indicated that gross commissions must be used to calculate the step down in support, applied prospectively, and that Timothy was also estopped from claiming that he had overpaid support for the years prior to the April 2012 order.

Loren also asserted that Timothy had not paid or had "short[ed]" her spousal support for many months.

### E. *The Parties' Supplemental Briefs*

In a supplemental brief, Loren argued that the doctrine of equitable estoppel applied to the case. She contended that Timothy should be "estopped from relying on a calculation method in the 2003 order that he agreed, both in word and in deed, over a multi-year period was not applicable." According to Loren, she "relied, to her detriment,

4

on this agreement and religiously complied with the Court order as she believed it to be and as [Timothy] led her to believe. The clear detriment to [her] would be the consequence that [Timothy] now seeks: numerous years of adjustments plus interest at 10%, which seems manifestly unfair given [Timothy's] actual and implicit agreement to the contrary."

In his supplemental brief, Timothy argued that Loren was "relying on equitable estoppel in an attempt to shoehorn what really is a forbidden waiver or laches argument." He characterized Loren's argument as follows: "Payee accepted less than the full amount over a period of time, Payor argues that there is an agreement and that Payee has waived rights to the other amounts due under the order." According to Timothy, this analysis was "expressly forbidden under existing statutory and case law."

Timothy argued that, consistent with the language of the 2003 stipulation and order, the parties' original intent, and the parties' initial conduct, the trial court in April 2012 found that the language of the earlier order pertains to gross commissions. Timothy contended that the April 2012 order "reaffirm[ed]" the original 2003 order, and thus the earlier order "continues in effect without change." He also contended that equitable estoppel must be shown by clear and convincing evidence, and that it did not apply in the circumstances of the case.

## F. *The March 2013 Order Regarding the Potential Applicability of Equitable Estoppel*

By written order after a hearing in March 2013, the trial court determined that equitable estoppel was "available as a defense in this matter, but whether or not the Court will find that equitable estoppel applies will depend upon the facts as the Court determines them to be after hearing testimony in the matter." The court stated that, to prove equitable estoppel, "more will be required than a showing of [Timothy] simply 'doing nothing' over a period of years." The court also determined that "the principles of waiver and laches are not legally available as defenses in this matter." The matter was

scheduled for a further hearing regarding whether equitable estoppel could be established by Loren, the amount owed by either party, the structure of payment or repayment going forward, including interest if appropriate, and attorney's fees.

### G. *The Evidentiary Hearing*

The trial court held the evidentiary hearing on April 3, 2013. The parties agreed that if gross commissions were used, Loren owed Timothy $17,880 excluding interest. The court indicated that Loren had the burden of proof on the issue of equitable estoppel.

### 1. Loren's testimony

Loren testified that after the parties entered into the 2003 stipulation, she calculated the "step-downs" for the first three 6-month periods by using her gross commissions. She then changed her mind and used net commissions based on communications with her then attorney, Jack Uebberhein. At the time, she did not know that the court order was based on gross rather than net commissions, and she had asked Uebberhein whether the calculation should be based on gross or net. In a February 20, 2004 email, Uebberhein told her: "I don't believe the intent was to say GROSS com[m]issions. It was to be com[m]issions after expenses. T[o] do otherwise would be contrary to the intent of the law. Spousal [support] would be reduced only on NET. [¶] Best way to do it is to do an accounting which shows gross less expenses. That's the right way. [¶] If you quit your office management job it should be because your real[ ]estate work is taking up all your time so that you can no longer do the management. Be a good idea to get some sort of letter from your employer to vef[i]fy the transition. . . . [¶] Mor[e] than happy to discuss w[ith] you in person. Next week is good."

At the evidentiary hearing, Loren did not recall any further communication with Uebberhein on the issue. She had been frustrated "that it wasn't explained to [her] properly by anybody," and that the order "was written the way it was written and [her attorney] didn't clean it up." She felt that she "had overpaid or paid back [Timothy]

6

some payments that [she] really shouldn't have" based on her initial use of gross commissions to calculate the step down in support.

With respect to determining net commissions, Loren subsequently met with Randy Reynolds, the accountant who did her and Timothy's tax returns when they were married, because she "didn't know what to do." Loren "just started being self-employed" and "didn't know about deductions and things," so she met with Reynolds "who did them for [her]." Reynolds did the accounting for three periods regarding Loren's office expenses and other deductions for purposes of her calculating the step down on spousal support. She paid Reynolds "close to $400" each time he did the accounting.

Loren periodically provided documents to Timothy showing the calculations for the step down on spousal support, including the individual expenses that she deducted from her commissions beginning in at least March 2005 almost continuously through at least August 2010. In one of the accompanying emails, dated September 14, 2005, Loren stated: "Hi Tim, [¶] Here are my figures and calculations for you regarding the step down order (March 2005 – August 2005.) [¶] I keep trying to refine my system. It's getting better for me as I go along. It is very involved and time consuming though. I have been in contact with Randy Reynolds in getting the information for the percentage deductions for the different categories. . . . [¶] As I mentioned earlier, since this is the first one where I have sat down and did all the deductions, I realize just how much there is and possibly I might not of had to repay as much on the previous periods. This is so time consuming however, that I will chalk that up to experience! [¶] I hope I have been clear on my calculations for you. Please let me know if you have any questions. I can provide the receipts also if you would like. [¶] Thanks, [¶] Loren."

In another email dated September 14, 2005, Loren stated to Timothy: "No problem. I am sitting down going over the final step down stuff tonight. Randy went on vacation and I needed to talk to him about my expenses and the percentages I can deduct, etc.[] I finally got that firmed up with him yesterday, and I was waiting for a copy of an

7

invoice from my web site, which I got. . . . [¶] I think I need to talk about the deductions with you in case you don't know. Everyone here that I work with (who have been self employed forever, unlike me) had told me what I earn would be LESS my direct expenses. I called my attorney and he said yes, that's true and that's the way it works. If you need to contact yours, please do. I just want to be clear and up front about it with you. [¶] I . . . will not have to repay anything this time, and since this is the first time I am looking at all of the expenses like this, it's more than I realized. I think I might not of had to repay as much on the previous ones, but I am not going to go back. (It really is a pain and is quite involved!) [¶] I have a letter from my Broker for you stating how much I earned during this time period, and I have done all my expenses on a spreadsheet. Would you like copies of the receipts and invoices I have as well? [¶] . . . I am seriously considering leaving my desk job around the first of the year and go to being a Realtor full time and as my ONLY job. . . ."

In addition to email communications, Loren also had verbal conversations with Timothy about the calculation for the step down on spousal support beginning in early 2004 after she learned from attorney Uebberhein that she might be using the wrong method. Loren and Timothy were on "friendly terms" and "would get together at different events for the kids." "[F]rom time to time" on those occasions, Loren would tell Timothy that the "calculations and deductions and figures would be coming to him" and "would reassure[] him it was coming if [she] was getting close to the date or over." The calculations were "quite tedious" and "very time-consuming" and she compared it to "doing [her] taxes."

Loren denied that Timothy had complained to her by email when she first started using net commissions instead of gross commissions. Loren testified that after she told Timothy she was changing her method of calculation, he never specifically said, "Yeah, that's okay," or that he agreed with using net commissions. He "just went along with it and never disagreed each time [she] would present the calculations and deductions to

8

him." According to Loren, Timothy "didn't question anything" she said, and he "never objected or said anything otherwise."

For example, in a February 2006 email to Timothy, Loren stated: "As far as the deductions, it's all stuff that I get to deduct on my taxes and from my gross commis[s]ions, so it seems to me that that would all be allowed as the government allows it. I get the percentages from Randy and have worked with him on all of this. There really are a lot of expenses on a commission based sales job." In a responding email, Timothy proposed paying spousal support for a period of time without any step down, and he did not specifically address the issue of gross or net commissions.

In a March 14, 2007 email, Loren sent a calculation sheet to Timothy. Timothy responded by email: "Hi Loren [¶] I got it this time. I just hope your not taking these deductions on your taxes also. It would be a problem. Just an F.Y.I. [¶] Thanks Tim." Loren emailed Timothy again that same day: "Glad you got it ok. I prepare my taxes and this stepdown with Randy's direction of course. There really are a lot of expenses in this business . . . . These are all legit deductions that I have documentation for. Being self employed allows a lot of deductions. I know its probably hard to comprehend-everyone thinks Realtors make tons of money, but most don't. [¶] Also please remember that the first several times that I paid back, NOBODY had instructed me (my attorney) that I should be deducting my expenses. I more than likely would not have had to pay that money back."

On cross-examination, Loren acknowledged that she had previously collected too much interest from Timothy for spousal support arrearages. As for the correct figure, she indicated that she was going to rely on her counsel, and her counsel conceded that interest had been miscalculated by $3,508.40.

### 2. Timothy's testimony

Timothy testified that Loren did not verbally discuss the issue of "net versus gross" commissions with him. Further, he never told her it was "okay" to use net rather

9

than gross commissions. Instead, "soon after" he received her email about changing the method of calculation, he "sent an email back to her not agreeing with her . . . going from gross to net." He testified that he did not have a copy of the email although he had tried to retrieve it. He further testified that after he emailed his objection to her changing the method of calculation, Loren sent the September 14, 2005 email stating, "No problem."

Timothy testified that the first time he heard that Loren had paid the accountant was at the evidentiary hearing. When asked who Loren was referring to in one of the September 14, 2005 emails when she talked about "Randy," Timothy stated he had "no idea." He later acknowledged that Randy Reynolds was an accountant who did their taxes before they separated. He claimed to have "no idea" whether Reynolds was charging or providing free services to Loren.

Regarding the March 2007 email in which Timothy told Loren that he hoped she was "not taking these deductions on [her] taxes" and that "[i]t would be a problem," Timothy testified that he "thought she was taking a lot of bogus deductions" and that she should not be "[d]ouble deducting against both alimony step-down calculations and taxes."

Regarding spousal support, Timothy acknowledged that he owed support for the current month ($1,200) plus $6000 for several prior months, minus $3,588.93 that he recently paid.

### 3. The arguments by counsel

After receiving evidence, the trial court heard argument from counsel. Initially, Timothy's counsel expressed uncertainty about the court's "ruling last time." The court stated: "The ruling was, and this essentially runs counter to my feelings, but the law seems clear that where you have support issues, the doctrine of waiver doesn't apply. The doctrine of laches doesn't apply. [¶] But I found a case that suggests that equitable estoppel still does. And the hearing is a factual basis for making a finding of equitable

10

estoppel, which I really want to do given the fact that he waited for six or eight years to make an issue out of this, but I understand that's the law."

Timothy's counsel proceeded to argue that Loren had failed to prove the elements of equitable estoppel by clear and convincing evidence. According to Timothy's counsel, Loren "was unjustly enriched" by her method of calculating the step down on spousal support, "she should have filed a motion to modify the order if she thought it was net instead of gross" commissions, and even if Timothy "did nothing" in response to Loren his inaction was not "unconscionable" for purposes of whether equitable estoppel applied. Timothy's counsel also argued that Loren had to show she was "a party ignorant of the truth," but she was present when the court made the order concerning commissions. Further, Loren had to show that Timothy's inaction or conduct caused her to change her position for the worse, but "she didn't need to change her position" by using net instead of gross commissions. Counsel asserted that Loren was trying to use equitable estoppel "as a way to get around laches" but the "equitable estoppel theories . . . [were] not available to her."

Loren's counsel argued that Loren had notified Timothy as soon as she learned from attorney Uebberhein "that she had been using what she then believed was an incorrect calculation method." Further, Loren "did the right thing" by emailing Timothy and sending him "detailed calculations regarding her claimed expenses from her gross income." In addition, by at least March of 2007, if not before, Timothy "approv[ed] of her methodology, but thought he would give her an FYI about her taxes." Counsel argued that Timothy's response to Loren was "the opposite of an objection" and that Loren "absolutely relied on this stream of communications between them." Counsel characterized Loren's actions as that of a "scrupulous recordkeeping person who made every effort to communicate with [Timothy] on these records as she was required to do."

Loren's counsel also raised the issue of the "clarification" Loren sought from the trial court in 2012 concerning the original order. In the alternative to finding that

11

equitable estoppel applies, Loren's counsel argued that the trial court should "run its clarification going forward and prospectively" from the April 2012 order.

Timothy's counsel responded that the original 2003 stipulation and order was still in effect, it was not modified as requested by Loren in 2012, and that Loren should not be allowed to use equitable estoppel to retroactively modify the original order. According to Timothy's counsel, Family Code section 3651 precluded the retroactive modification of accrued arrearages or any interest due thereon, Loren owed Timothy $17,880 under the original order, and Timothy was entitled to interest on that amount.

Loren's counsel contended that the standard of proof regarding equitable estoppel was preponderance of the evidence. Further, to the extent the court determined that equitable estoppel did not apply and that Loren owed money, it "wasn't the kind of liquidated item . . . subject to interest." Counsel also argued that the original 2003 stipulation was "ambiguous," that Loren asked the court to rule on the issue in 2012, and that as to "when the start for the gross versus net would run" the court should "run that prospectively" from its 2012 ruling.

## H. *The Trial Court's Ruling*

After hearing argument from counsel, the trial court stated that the standard of proof was a preponderance of the evidence and that the issue was "what's equitable." The court explained that its April 2012 ruling concerning the original 2003 marital settlement agreement was based on the plain meaning of the terms of the agreement. Although the court did not believe the 2003 agreement was ambiguous with respect to the term commission, the court indicated that the agreement did not make good sense. The court stated: "[I]n this world where we set support for children and for spouses, the support is based on incomes that people actually earn. [¶] When we take somebody's gross wages, those are the gross wages. We subtract from it taxes that are paid; the computer does that. But that is actually money that the employer reports that they actually paid to the person. [¶] When you're a real estate agent, you don't actually get

12

the commissions; you pay money to earn them. And in that sense, the idea that somebody actually agreed to net out, or not to net out, but to subtract or use gross commissions in calculating step-downs is odd to me. But the plain meaning of gross commissions is gross commissions."

Turning to the evidence, the trial court determined that it was "undisputed" Timothy did not complain from 2003 until 2012, or 2004 until 2012, about how the step down in spousal support should be calculated. The court further believed that the case did not involve "a normal waiver situation" where a person is owed a fixed amount of $1,000, for example, and takes $500 one month and $500 another month and the person paying never has "to explain it because it is clear." The court contrasted that situation with the present case: "There is work to calculate the step-downs. And [Loren] did all that work, and she actually communicated it to him. And I do find . . . her entirely credible based on the fact that she relied on her attorney. She relied on people that she worked with. And she faithfully, and in quite a detailed fashion, disclosed over and over again to [Timothy] how she was making these calculations."

The trial court further stated: "What is important to me is that she also communicated to him earlier on, it was expensive and time-consuming to do these calculations. It would have been a lot simpler just to report her gross commissions and she did that originally. She clearly reported she was changing her method. The bottom line is that she went to great efforts to do this, and detrimentally relied on [Timothy's] silence. I don't think he was totally silent.

"The interesting email is the one where he says that: 'I hope you're not taking these . . . deductions on your income tax,' which is interesting for two reasons. One, that despite his testimony here today that he thought these were totally bogus, which is somewhat consistent with that actual statement to her about warning her not to take these on her personal income taxes; clearly he's consenting to her continuing to use this method of calculation for these step-down changes.

13

"Every six months she is giving him detailed changes showing what she has deducted. She has had discussions with him about the reason she was doing this, the advice that she got from her attorney and other people, and the time-consuming nature of going through these changes every six months.

"So I'm going to find that [Timothy] . . . is estopped from deducting or from having us go back and recalculat[e] seven or eight or nine years of these step-down payments. Because to do so would be inequitable, and that it doesn't acknowledge that [Loren] detrimentally relied on knowledge of what she was doing, the knowledge she was doing it, and expensive and time-consuming way, and he never really contested it."

The trial court also addressed Timothy's testimony that he had sent an email objecting to Loren's calculation method. The court stated: "If you did send her the email that you weren't able to find, I don't necessarily find that your claim is credible that you did write such an email, it doesn't fit in with -- normally people can find their emails and they can find them forever, it seems like."

The trial court explained that its ruling was also "based on the length of time here and the fact that this estoppel has lasted through now, that it continue to operate in the future as you go on down the road with this marital settlement agreement. There is no reason to undo the estoppel right now. That is, basically it's a course of conduct that [Loren and Timothy had] engaged in."

When asked by Timothy's counsel whether the trial court was "modifying the court order," the court responded: "No. I'm saying that [Timothy] is estopped to take the position that [Loren's] calculation of her commissions has been incorrect up to now. And on that basis, that is their course of conduct. And that's also an important factor in interpreting the parties' own understanding of their contract." The court further explained that its earlier 2012 ruling was based on the meaning of the language of the 2003 agreement "without hearing any of this evidence about equitable estoppel, and subject to that, [the court is] finding there is a sufficient basis for equitable estoppel. And

14

it's operated in the past and it's going to continue to operate in the future." "He is estopped from taking that position." Based on past spousal support that Timothy owed Loren, and taking into consideration Timothy's overpayment of interest for spousal support arrearages, the court concluded that Timothy owed Loren $102.67.

In a subsequent written order filed April 24, 2013, the trial court stated the following in denying Timothy's request for a determination of overpayment of spousal support: "1. . . . The Court declines to order attorney's fees to either party . . . . [¶] 2. The Court finds that the standard of proof in this matter shall be preponderance of the evidence. [¶] 3. The Court finds that [Loren's] testimony herein was entirely credible on the point of her notifying [Timothy] that she was going to a 'net commissions' calculation method, and that she relied on the advice of her attorney and her co-workers. [Loren] faithfully, and in quite detailed fashion, disclosed over and over again to [Timothy] how she was making the 'net' calculations. [¶] 4. The Court finds that [Loren's] calculations were expensive and time-consuming, and that [Loren] communicated this fact to [Timothy]. The Court finds that the great effort she put into her calculations constituted detrimental reliance. [¶] 5. The Court finds that [Timothy] was not 'totally silent' regarding his agreement to the new calculation method, but that in the email wherein [Timothy] warned [Loren] 'I just hope you're not taking these deductions on your taxes also' amounted to [Timothy] clearly consenting to [Loren's] continuing to use the 'net commissions' method of calculation. [¶] 6. The court finds that [Timothy] is, therefore, equitably stopped from retroactively re-calculating the prior years of step-down payments. Permitting [Timothy] to do so would be inequitable. [¶] 7. The Court further finds that [Timothy] is barred, going forward, by the same equitable estoppel, from seeking stepdown calculations based upon [Loren's] gross (as opposed to net) commissions. [¶] 8. The Court finds that there is an alimony arrearage, through April, of $3,611.07. The Court finds that this arrearage is offset by [Timothy's]

15

overpayment of interest to [Loren] of $3,508.40.  The net amount owing by [Timothy] to [Loren] is, therefore, $102.67."

Timothy filed a notice of appeal regarding the April 24, 2013 order.

### III. DISCUSSION

As an initial matter, we observe that Loren has not filed a respondent's brief.  Her "failure to file a respondent's brief means that we 'decide the appeal on the record, the opening brief, and any oral argument by the appellant' (Cal. Rules of Court, rule 8.220(a)(2) . . .), examining the record and reversing only if prejudicial error is shown.  [Citations.]" (*Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334.)

#### A.  Burden of Proving the Elements of Equitable Estoppel

Timothy contends that the trial court erred by determining that the preponderance of the evidence standard, rather than the clear and convincing evidence standard, applies to the issue of equitable estoppel.  He contends that the court's erroneous ruling concerning the burden of proof contributed to the court determining improperly that equitable estoppel applies in this case.

"The general rule in this state is that '[i]ssues of fact in civil cases are determined by a preponderance of testimony.'  [Citations.]" (*Weiner v. Fleischman* (1991) 54 Cal.3d 476, 483 (*Weiner*).)  Evidence Code section 115 states in part:  "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." "Law," as referenced in this section, includes "constitutional, statutory, and decisional law." (Evid. Code, § 160; see *Weiner*, supra, at p. 483.)  In *K.J. v. Arcadia Unified School Dist.* (2009) 172 Cal.App.4th 1229, an appellate court stated that estoppel "arises when a plaintiff establishes by a preponderance of the evidence" certain facts. (*Id.* at p. 1240.)  In contrast, in *In re Marriage of Brinkman* (2003) 111 Cal.App.4th 1281 (*Brinkman*), this court stated that "[t]he party seeking to establish an estoppel must" make the requisite showing "by clear and convincing evidence." (*Id.* at p. 1289.)

16

We need not resolve whether the elements of equitable estoppel must be shown by a preponderance of the evidence or by clear and convincing evidence. As we will next explain, even if the lower standard of proof applies, there was not sufficient evidence to support the application of the doctrine of equitable estoppel in this case.

## B. The Doctrine of Equitable Estoppel

Timothy contends that the elements of equitable estoppel were not present, and that therefore the trial court erred in determining that he was barred from recovering an overpayment of spousal support from Loren.

" 'The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he [or she] must intend that his [or her] conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he [or she] must rely upon the conduct to his [or her] injury. [Citation.]' [Citations.]" (*City of Goleta v. Superior Court* (2006) 40 Cal.4th 270, 279 (*Goleta*).) " 'Where one of the elements is missing, there can be no estoppel. [Citations.] The doctrine acts defensively only. It operates to prevent one from taking unfair advantage of another but not to give an unfair advantage to one seeking to invoke the doctrine. [Citation.]' [Citation.]" (*Brinkman*, *supra*, 111 Cal.App.4th at pp. 1289-1290.)

In general, "[t]he existence of an estoppel is a factual question," and thus the trial court's ruling is reviewed under the substantial evidence standard of review. (*J. H. McKnight Ranch, Inc. v. Franchise Tax Bd.* (2003) 110 Cal.App.4th 978, 991.) "When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling. [Citations.]" (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 319.)

17

The facts that are material to a resolution of the estoppel issue in this case are undisputed, and therefore we independently review whether Loren established the doctrine is applicable. In making this determination, we find the following three cases instructive.

In *Brinkman*, the parties dissolved their marriage in December 1998 and the father agreed to pay monthly child support to the mother. (*Brinkman*, *supra*, 111 Cal.App.4th at p. 1284.) Subsequent proceedings regarding child support arrears resulted in a family court settlement officer recommending in writing a reduction in monthly support in August 2000. (*Ibid.*) Although a formal order regarding a lesser monthly support amount was never executed, the father immediately reduced his support payments to the recommended lesser amount. (*Id.* at pp. 1284-1285.) The mother apparently accepted the lesser payments without objection for many months. (*Id.* at p. 1287.) Prior to a trial on support issues, the court determined that the mother was estopped from asserting any sum other than the reduced amount recommended by the settlement officer. (*Id.* at p. 1286.)

The mother appealed. The father argued that if the mother " 'had indicated her disagreement with [the lesser amount in the settlement officer's] indicated order, [the father] could have initiated proceedings to bring the question before the court for a formal order based upon [the settlement officer's] recommendation.' " (*Brinkman*, *supra*, 111 Cal.App.4th at p. 1289.) The father further argued that the mother had " 'induced [him] to believe that she would not claim support [above the recommended monthly amount]' " and that her acceptance of that amount was " '[e]stoppel by conduct.' " (*Ibid.*)

This court determined that the elements of estoppel were not established. (*Brinkman*, *supra*, 111 Cal.App.4th at p. 1291.) "Both parties knew the facts, namely, that the recommendation was not an order. Both parties were represented by counsel to advise them of the law governing modification of child support orders. Both parties had

18

knowledge of how to transform [the settlement officer's] recommendation to an executable order. [The mother] was adverse to the recommendation; it was not in her interest to move the court for an order. Consequently, it was up to [the father] to obtain the order. He did not. He has not shown that he was prevented or induced not to obtain the order. The parties interacted through their counsel and the litigation was fierce. Counsel stated the positions of their clients with clarity." (*Ibid.*) Paraphrasing from another case, this court also stated: " '[P]erhaps the real issue here is which party had the burden of clarifying which child support orders were in effect in and after [August 2000]. At bottom, we believe that [the mother] was entitled to rely on the entry of the [December 3, 1998] judgment as establishing [the father's] support obligations, and that it was incumbent upon [the father—upon receiving the settlement officer's recommendation]—to move immediately to [obtain an order of the court executing the recommendation]. Failing that, he was free to seek and obtain a reduction in his support obligations by stipulation or modification motion . . . . He was not free to simply ignore the judgment—as he admittedly did. Having failed to avail himself of the proper procedures for seeking modification of the support order[] contained in the [December 1998] judgment, [the father] is in no position to demand or obtain retroactive approval of this conduct. [Citations.]' [Citation.]" (*Ibid.*)

In *In re Marriage of Thompson* (1996) 41 Cal.App.4th 1049 (*Thompson*), the county was assigned the child's support rights, including the right to collect arrears from the father. (*Id.* at p. 1054.) In January 1994, the father left a telephone message requesting information on the balance due on his child support obligations, after apparently having difficulty obtaining financing because of a recorded abstract of support. (*Id.* at p. 1055.) The county responded by sending the father a computerized ledger page reflecting a " 'TOTAL MIN/DUE' " of $3,138. (*Ibid.*) The father sent a check for that amount to the county. More than a month later, the district attorney sought to renew a judgment regarding the father's child support obligation, claiming that nearly

19

$5,000 was due. (*Ibid.*) The father objected and claimed that the full amount of principal had already been paid. The trial court determined that the county was estopped from collecting any additional amount from the father. (*Id.* at pp. 1055-1056.) The county appealed, and the appellate court reversed the order. (*Id.* at pp. 1056, 1062.) The appellate court determined that the facts did not establish the elements necessary for an estoppel. Among other reasons, the appellate court stated: "[T]he record does not establish County knew the 'facts' regarding [the father's] child support arrears and he was ignorant of them as of January 1994. The [parties] were equally capable of calculating the principal amount of child support owed and the payments made." (*Id.* at p. 1061.)

In *In re Marriage of Umphrey* (1990) 218 Cal.App.3d 647 (*Umphrey*), a husband and a wife entered into a marital settlement agreement that was ultimately incorporated into a final judgment of dissolution. (*Id.* at pp. 653-654.) The wife thereafter sought to set aside the agreement and the judgment based on the husband's nondisclosure of community property assets. In opposition, the husband argued that the parties had separated earlier than the September 1979 date recited in the settlement agreement and that the lease he had subsequently entered into was therefore separate property. (*Id.* at p. 654.) The trial court believed the separation date was earlier than that set forth in the settlement agreement. The court ultimately vacated the judgment after determining that the court did not have jurisdiction to redetermine the separation date and that the husband was " 'estopped' " from arguing a different separation date. (*Ibid.*)

The appellate court reversed the order. On the issue of estoppel, the court concluded that "nearly all of [the] prerequisites [were] missing." (*Umphrey*, supra, 218 Cal.App.3d at p. 658.) Among other elements, the court reasoned that "if the September 1979 date was selected by Husband and constituted a 'promise or representation,' Wife could not have been ignorant of the true state of facts, since she knew as much about the circumstances surrounding the separation as did Husband."

(*Ibid.*) The appellate court further reasoned that, "[i]f, as the trial court apparently believed, the actual separation date shown by the evidence was earlier than that recited in the pleadings, application of the doctrine in the manner employed below would have the effect of converting Husband's separate property into a community asset. This would allow one party to receive an unjust windfall in the name of equity—a result abhorrent to modern jurisprudence." (*Id.* at p. 659.)

In this case, the trial court believed that equitable estoppel applied after finding that Loren incurred significant expenses and spent considerable time calculating net commissions for several years, and that Timothy consented to the use of net commissions. Although we are not unsympathetic to the effort Loren put into her calculations for several years, "our task as an intermediate court of appeal is limited to interpreting and applying existing law." (*Keh v. Walters* (1997) 55 Cal.App.4th 1522, 1533.) As we stated, the elements of equitable estoppel are that " '(1) *the party to be estopped must be apprised of the facts*; (2) he [or she] must intend that his [or her] conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) *the other party must be ignorant of the true state of facts*; and (4) he [or she] must rely upon the conduct to his [or her] injury. [Citation.]' [Citations.]" (*Goleta*, *supra*, 40 Cal.4th at p. 279, italics added.)

In this case, *both* parties knew the facts, namely, the content of the original 2003 stipulation and order, which set forth the method of calculating the step down in spousal support. The trial court found that the plain meaning of the 2003 stipulation and order required that step down calculations be based on gross commissions, and Loren herself interpreted it similarly, as her initial step down calculations were based on gross commissions. However, subsequent to the 2003 stipulation and order, after using gross commissions for a period of time, and after communications with her attorney, *Loren* decided to change her position and use net commissions to calculate the step down in spousal support. Although Loren and her counsel's interpretation of "commissions" to

21

mean net commissions, rather than gross commissions, ultimately proved to be incorrect as reflected in the trial court's April 2012 order, there was no evidence that *Timothy* had different or superior knowledge to Loren or her counsel about the correct interpretation of the original 2003 stipulation and order. There is also no evidence to suggest that Loren was precluded from seeking clarification from the court or a different definition of the term commission earlier than when she did, which was sometime just prior to the court's April 2012 order, in order to confirm her changed position regarding the use of net commissions rather than gross commissions to calculate the step down in spousal support. Loren's delay in seeking such clarification resulted in her miscalculating the step down amount for several years. In view of our determination that at least one of the elements of equitable estoppel is missing — Timothy being apprised of the facts while Loren is ignorant of the true state of facts — " 'there can be no estoppel.' " (*Brinkman*, *supra*, 111 Cal.App.4th at p. 1289; see also *id.* at p. 1291; *Thompson*, *supra*, 41 Cal.App.4th at p. 1061.)

Moreover, the record does not reflect that Timothy took unfair advantage of Loren with respect to the correct interpretation of the original 2003 stipulation and order. (*Brinkman*, *supra*, 111 Cal.App.4th at pp. 1289-1290.) To the contrary, the trial court determined in the April 2012 order that the original 2003 stipulation and order required the use of gross commissions, and Loren initially used gross commissions when making the first few step down calculations. Loren's failure to continue to use gross commissions in her calculation for several years thereafter resulted in Timothy overpaying spousal support by several thousand dollars. Application of equitable estoppel to preclude Timothy from recovering the overpayment "would allow [Loren] to receive an unjust windfall in the name of equity—a result abhorrent to modern jurisprudence." (*Umphrey*, supra, 218 Cal.App.3d at p. 659.)

Accordingly, as our task as an appellate court is limited to interpreting and applying the law, we determine that the trial court erred by finding that the doctrine of

equitable estoppel applied in this case to preclude Timothy from seeking the recovery of spousal support that had been overpaid.

## IV.  DISPOSITION

The April 24, 2013 order is reversed and the matter is remanded for further proceedings on Timothy's September 2012 request to determine overpayment of spousal support.  The parties are to bear their own costs on appeal.


_____
BAMATTRE-MANOUKIAN, ACTING P.J.


WE CONCUR:


_____
MÁRQUEZ, J.


_____
GROVER, J.

23