Filed 9/22/15  Heritage Oaks, LLC v. County of Monterey CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| HERITAGE OAKS, LLC, | H040682 |
| Plaintiff and Appellant, | (Monterey County Super. Ct. No. M109417) |
| v. | |
| COUNTY OF MONTEREY, | |
| Defendant and Respondent. | |

Heritage Oaks, LLC (Heritage Oaks) appeals from the trial court's order denying its petition for writ of administrative mandamus.  (Code Civ. Proc., § 1094.5.)  Heritage Oaks filed its petition after respondent County of Monterey (County) rejected its application to develop approximately 79 acres of property for residential purposes.  Heritage Oaks contends:  (1) the trial court failed to exercise its independent judgment in reviewing the County's decision; (2) the County violated Government Code section 66474.2, because it failed to apply the long-term water supply policy in effect when Heritage Oaks' project application was deemed complete; (3) the record lacks substantial evidence that Heritage Oaks' water recharge system would not work; and (4) the County violated Heritage Oaks' constitutional rights to due process and equal protection.  We reject these contentions and affirm the order.

### I. Procedural and Factual Background

In May 1999, Heritage Oaks submitted an application for a combined development permit which consisted of a standard subdivision to divide approximately 79 acres into 32 residential parcels; a use permit for the removal of approximately 367 protected oak trees; a use permit for four rental units; and grading. The application was deemed complete in October 1999. After multiple hearings, the planning commission denied the application without prejudice in December 2000.

In September 2005, the County advised Heritage Oaks that "[a]s of August 26, 2005, the Monterey County Water Resources Agency (WRA) determined that there might not be a long-term sustainable use of water for the Heritage Oaks Subdivision." Heritage Oaks was also informed that due to this "significant new information . . . the project may not be able to be approved. The 'can and will serve' letter from the Aromas Water District means that the District . . . may not have a sustainable water use to serve this project for the long-term, even though the District may have enough connections to serve the project." The County requested that Heritage Oaks respond in writing regarding whether it wanted to proceed with the project in light of this information.

Heritage Oaks chose to have an environmental impact report (EIR) prepared. The draft EIR stated that studies since 1952 have documented declining water levels and seawater intrusion in the north Monterey County area. The North Monterey County Hydrogeologic Study (Fugro Report), which was prepared in 1995, concluded that the Highlands North subbasin, where the project was located, was in chronic overdraft and was beginning to be impacted by seawater intrusion. The draft EIR also stated that fully restoring ground water basins to pre-intrusion conditions had never been documented. The draft EIR found: "The proposed project would result in a 4.7-acre-foot per year net demand in recharge onsite. This net demand represents a potentially significant impact. Mitigation is proposed to address this significant impact; however, it would not reduce

2

the significance of this impact to a level of less than significant." The draft EIR circulated from October 2007 until December 2007.

After the public review period for the draft EIR had closed, Heritage Oaks submitted a new stormwater infiltration design and water balance evaluation. A portion of the draft EIR was revised to address the hydrologic assessment and was recirculated from December 2008 until February 2009. The project included drainage improvements which were designed: to retain most of the runoff onsite; to treat runoff from paved surfaces to improve water quality; to control runoff to prevent any impact downstream and on adjacent properties; and to repair erosion problems on the site. The improvements consisted of the following: the majority of roads would be sloped to promote the flow of water to adjacent, naturally landscaped areas; the runoff from road sections that were built on fill slopes would be collected in a ditch and conveyed to a dry pond or to infiltration trenches along the road; roads on slopes that were over eight percent would use drainage channels to convey runoff to infiltration ditches; and each residence would have a subsurface infiltration system to capture runoff from the roof and the driveway.

The recirculated draft EIR included a revised drainage analysis based on information outlined in the Revised Drainage Analysis and Preliminary Drainage Plan prepared by Fall Creek Engineering, Inc. (Fall Creek Report). The recirculated draft EIR stated that the project would result in a 1.3 acre-foot per year increase in recharge onsite.[1] However, this finding relied on several assumptions, including that "collected stormwater will be infiltrated more efficiently than under natural conditions" and that water usage for

---

[1]    In calculating the increase in recharge onsite, the recirculated draft EIR decreased the amount of gross water demand for the apartments to 0.4 acre feet per year rather than 0.7 acre feet per year which was used in the draft EIR. The recirculated draft EIR also found a positive expected recharge post-development of 7.7 acre feet per year based on natural recharge, the infiltration trenches, and the septic and irrigation return minus residential demand. The draft EIR found a negative expected recharge post-development of -14.66 acre feet per year based on residential recharge minus natural recharge at post-development from homes and roads minus residential demand.

3

each residential lot would not exceed the gross demands used in the calculations. It was also noted that "[t]he projected increase in the water balance after development is predominately dependent on the quantity of average rainfall and on the magnitude of the drainage-capture. If water collected and directed to infiltration trenches (and discharged to the ground below the root zone) is assumed to be 90 percent, there is an increase in water balance after development."

The recirculated draft EIR also included the Revised Hydrogeologic Assessment prepared by Kleinfelder, Inc. (Kleinfelder Report). The Kleinfelder Report recognized that the trend of groundwater depletion in the vicinity of the project confirmed the Fugro Report's conclusion that the area was in chronic overdraft, that "increase[d] rates of overdrafting the basin may increase the rate of seawater intrusion in the Highlands North area," and that "deterioration of groundwater could be expected now or in the near future in the vicinity of the Heritage Oaks property." Regarding the revised calculations on the water recharge system, the Kleinfelder Report stated: "The projected increase in the water balance after development of the Heritage Oaks Subdivision is predomina[n]tely dependent on the quantity of average rainfall and on the magnitude of the drainage-capture factor in the table above. These two quantities are sensitive factors in the water-balance analysis. If the water collected and directed to the infiltration trenches (and discharged to the ground below the root zone) is assumed to be 90% in the calculation, then there is an increase in water balance after development. However, if the percentage of actual recharge of collected drain water is reduced to 85% or less, the water balance will be negative."

The responses to the comments received on the recirculated draft EIR were completed in August 2009. The draft EIR, the recirculated draft EIR, and the responses to the comments constituted the final EIR.

The North County (Non-Coastal) Land Use Advisory Committee, the Standard Subdivision Committee, and the County staff recommended approval of the project to the

4

planning commission. However, following public hearings, the planning commission found that the project was inconsistent with various applicable plans and policies due to lack of a sustainable water supply in the area and denied the application.

Heritage Oaks appealed the decision to the Monterey County Board of Supervisors (Board). The Board held a public hearing in June 2010, adopted a resolution of intent to deny the appeal, and directed staff to return with a resolution with findings and evidence for denial. In July 2010, the Board adopted resolution No. 10-240, which determined: the project was inconsistent with General Plan goals and policies (Goal 53, Objective 53.1, and Policy 53.1.3) and North County Area Plan policies (Policy 6.1.4 and Policy 26.1.4.3); the design of the subdivision was likely to cause serious public health problems; and the subdivision did not meet the requirement of the Subdivision Map Act (Gov. Code, § 66474)[2] or Monterey County Code (County Code) chapter 19.03.025, subdivision (F).[3] Thus, the Board denied the appeal.

In November 2010, Heritage Oaks brought a petition for writ of mandate, writ of administrative mandamus, and declaratory relief, which was denied. The trial court concluded: the Board applied the policies in effect when Heritage Oaks' application was

_____

[2]    Government Code section 66474 provides in relevant part: "A legislative body of a city or county shall deny approval of a tentative map, or a parcel map for which a tentative map was not required, if it makes any of the following findings: [¶] (a) That the proposed map is not consistent with applicable general and specific plans as specified in Section 65451. [¶] (b) That the design or improvement of the proposed subdivision is not consistent with applicable general and specific plans. [¶] . . . [¶] (f) That the design of the subdivision or type of improvements is likely to cause serious public health problems."

[3]    County Code chapter 19.03.025, subdivision (F) provides in relevant part: "A tentative map may be denied on any grounds provided by law. A tentative map shall be denied if any of the following findings are made: 1. That the proposed tentative map is not consistent with the applicable general plan, area plan, coastal land use plan or specific plan. [¶] 2. That the design or improvement of the proposed subdivision is not consistent with General plan, area plan, coastal land use plan, or specific plan. [¶] . . . [¶] 6. That the design of the subdivision or type of improvements is likely to cause serious public health problems."

5

deemed completed; substantial evidence supported the Board's finding that Heritage Oaks had failed to demonstrate the availability of a long-term water supply for the project; and the Board did not abuse its discretion in denying the application, because the project was inconsistent with various County plans, policies, and objectives.

## II. Discussion

### A. Standard of Review

Judicial review of administrative action affecting land use is governed by Code of Civil Procedure section 1094.5. (*SP Star Enterprises, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 459, 468.) "If the administrative decision involved or substantially affected a 'fundamental vested right,' the superior court exercises its independent judgment upon the evidence . . . ." (*Id.* at p. 469.) However, where no such right is involved, "the trial court's review is limited to examining the administrative record to determine whether the agency's decision and its findings are supported by substantial evidence in light of the whole record. [Citation.] [¶] . . . [A]n appellate court reviewing a trial court's ruling on administrative mandamus [also] applies a substantial evidence standard. [Citations.] . . . '[T]he appellate court's function is identical to that of the trial court. It reviews the administrative record to determine whether the agency's findings were supported by substantial evidence, resolving all conflicts in the evidence and drawing all [reasonable] inferences in support of them. [Citations.]' [Citation.]" (*Ibid.*) Moreover, "[w]hen we review an agency's decision for consistency with its own general plan, we accord great deference to the agency's determination. This is because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.] . . . A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those

6

policies.' [Citation.]" (*Save our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142.)

Heritage Oaks contends that Government Code section 66474.2 provides "the subdivider a form of a vested right," and thus the trial court erred by failing to exercise its independent judgment in reviewing the denial of its application.[4]

Government Code section 66474.2, subdivision (a) provides, in relevant part, that "in determining whether to approve or disapprove an application for a tentative map, the local agency shall apply only those ordinances, policies, and standards in effect at the date the local agency has determined that the application is complete." (Gov. Code, § 66474.2, subd. (a).) The County agrees that Heritage Oaks' project was entitled to application of the ordinances, policies, and standards in effect in October 1999 when Heritage Oaks' application was complete, but disputes that this statute creates a fundamental vested right.

"The term 'vested' in the sense of 'fundamental vested rights' in an administrative mandate proceeding is not synonymous with the 'vested rights' doctrine relating to land use development. [Citation.] Courts rarely uphold the application of the independent judgment test to land use decisions. [Citation.] Cases upholding such application typically involve 'classic vested rights'—i.e., a vested right to develop property in a particular way." (*Amerco Real Estate Co. v. City of West Sacramento* (2014) 224 Cal.App.4th 778, 783-784.)

Here, Government Code section 66474.2 required the County to apply ordinances, policies, and standards in effect in 1999. However, this statute did not provide Heritage Oaks with the right to develop its property in a particular way. Since the present case did

---

[4] At the hearing on the petition for administrative mandamus, counsel for Heritage Oaks expressly agreed with the trial court that the appropriate standard of review was substantial evidence to support the Board's findings.

not involve a fundamental vested right, the trial court properly reviewed the record for substantial evidence to support the Board's findings.[5]


## B.  Compliance with Government Code Section 66474.2

Heritage Oaks contends that the Board failed to comply with Government Code section 66474.2.  Heritage Oaks asserts that the sole long-term water supply standard in 1999 was set forth in former County Code chapter 18.51 and it complied with this standard by paying the water impact fee.

Pursuant to former chapter 18.51.050 of the County Code, Heritage Oaks was required to pay a water impact fee of $1,000 for each parcel in the subdivision.  The purpose of the fee was to study and monitor groundwater conditions in the north Monterey County area.  (Former County Code, ch. 18.51.070.)  Former County Code chapter 18.51.040, subdivision (C) allowed for the amount of the fee to be reduced by the costs of any hydrological reports for an EIR.  Heritage Oaks paid over $32,000 for the hydrologic component of the EIR, and thus complied with former County Code chapter 18.51.

However, there were additional ordinances, policies, and standards applicable to the present case.  In its resolution denying the project, the Board acknowledged that it was required to comply with Government Code section 66474.2 and did not dispute that former County Code chapter 18.51 applied to the project.  However, the Board also

---

[5]    We also note that *Hock Investment Co. v. City and County of San Francisco* (1989) 215 Cal.App.3d 438 (*Hock*) does not support Heritage Oaks' position.  *Hock* held that the trial court abused its discretion in sustaining a demurrer when it appeared that the appellant could state a cause of action for estoppel.  (*Id.* at pp. 444-449.)  Here, there is no issue in the present case as to whether Heritage Oaks has stated a cause of action for estoppel.  More importantly, *Hock* did not consider the appropriate standard of review in an appeal governed by Code of Civil Procedure section 1094.5.  " '[I]t is axiomatic that cases are not authority for propositions not considered.' [Citation.]" (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1160.)

8

concluded: "The General Plan policies with which this Board finds that the project is inconsistent -- Goal 53, Objective 53.1, and Policy 53.1.3 - were all in effect in October 1999 and continue to be in effect today. The North County Area Plan policies with which this Board finds that the project is inconsistent - Policy 6.1.4 and Policy 26.1.4.3 --- were also in effect in October 1999 and remain in effect today."

Goal 53 of the General Plan states: "To promote adequate water service for all county needs. [¶] Objective [¶] 53.1 Achieve a sustainable level of adequate water services. [¶] Policy [¶] 53.1.3 The County shall not allow water consuming development in areas which do not have proven adequate water supplies."

Policy 6.1.4 of the North County Area Plan states: "New development shall be phased until a safe, long-term yield of water supply can be demonstrated and maintained. Development levels that generate water demand exceeding safe yields of local acquifers shall only be allowed once additional water supplies are secured." Policy 26.1.4.3 of the same plan provides that an application for a subdivision map "shall not be approved" unless the "applicant provides evidence of an assured longterm water supply in terms of yield and quality for all lots which are to be created through subdivision."[6]

The Board recognized that the North County Area Plan did not define "safe, long term yield of water supply . . . ." Thus, the Board turned to the County's Subdivision

---

[6]     Policy 26.1.4.3 of the North County Area Plan states: "A standard tentative subdivision map and/or vesting tentative and/or preliminary project review subdivision map application for either a standard or minor subdivision shall not be approved until: [¶] 1) An applicant provides evidence of an assured longterm water supply in terms of yield and quality for all lots which are to be created through subdivision. A recommendation on the water supply shall be made to the decision making body by the County's Health Officer and the General Manager of the Water Resources Agency, or their respective designees. [¶] 2) The applicant provides proof that the water supply to serve the lots meets both the water quality and quantity standard as set forth in Title 22 of the California Code of Regulations, and Chapters 15.04 and 15.08 of the Monterey County Code subject to the review and recommendation by the County's Health Officer to the decision making body."

Ordinance. County Code chapter 19.02.143, which was in effect in 1999, defines "safe, long-term water supply (safe yield)" as "the amount of water that can be extracted continuously from the basin or hydrologic sub-area without degrading water quality, or damaging the economical extraction of water, or producing unmitigatable adverse environmental impacts." Thus, Heritage Oaks is incorrect that former County Code chapter 18.51 was the sole long-term water supply ordinance, policy, or standard applicable to its project in 1999. Heritage Oaks was also required to demonstrate, among other things, that the area to be developed had "proven adequate water supplies" (General Plan, Policy 53.1.3) and "assured longterm water supply in terms of yield and quality for all lots which are to be created through subdivision." (North County Area Plan, Policy 26.1.4.3.)

Heritage Oaks contends, however, that the County violated Government Code section 66474.2, because it changed its interpretation of the long-term water supply standard that was in effect in 1999.

In order to support this contention, Heritage Oaks relies on comments by County staff. At a hearing before the Board in December 2008 on another project, Curtis Weeks of the Monterey County Water Resources Agency (MCWRA) stated that "the way in which we handled the issue of being in overdraft at the time at which this application came forward was to develop a mitigation fee." At the hearing before the planning commission in September 2009, Tom Moss of the MCWRA stated that "the basin as a whole is in overdraft. So that has driven the policy in this area and from 1990-2000 the policy, we had an ordinance on our books that required applicants to pay a $1,000 per lot fee. . . . This project was deemed complete in 1999 so those were the rules that were applied to this project. The moratorium was from 2000-2002 and since that time we've been trying to define what does long-term sustainable water supply mean and . . . there's not an objective set of criteria at this time." In December 2009, the County staff report for the Board meeting stated in relevant part: "Under the rules in effect for pipeline

projects when the [Heritage Oaks] application was deemed complete, compliance with the fee requirement was sufficient to satisfy Title 19 regulations regarding long term water supply."

As *Bright Development v. City of Tracy* (1993) 20 Cal.App.4th 783 (*Bright*) explains, statements by an agency's employees are not controlling in determining whether a local agency has complied with Government Code section 66474.2.  In *Bright*, the city required the developer to underground off-site utilities.  (*Bright*, at p. 790.)  Though several written, public standards did not include this requirement, the city argued that its consistent interpretation of them amounted to an established "standard" within the meaning of Government Code section 66474.2.  (*Bright*, at pp. 796-797.)  The Court of Appeal rejected this argument:  "In support of this claim, City cites exclusively to the declarations of its employees received in evidence by the trial court.  The declarations are entitled to little weight in resolving the issue whether, at the time plaintiff's vesting tentative map application was deemed complete, City had an ordinance, policy or standard in effect which required developers at their own expense to underground off-site utilities.  City has not shown a written ordinance, policy or standard so requiring was in effect.  At best the declarations tend to show no more than that the declarant City employees believed there was such an unwritten policy in effect.  But the declarations do not establish whether the 'policy' existed outside the minds of these employees."  (*Id.* at p. 797.)  Here, as in *Bright*, County staff's interpretation of the term "safe, long-term water supply" is not controlling.

Heritage Oaks argues that *Bright* is distinguishable from the present case, because former County Code chapter 18.51 was a written policy.  We disagree.  Heritage Oaks has not cited any language in this ordinance which either defined "safe, long-term water supply" or set forth a specific policy or standard related to the adequacy of a water supply.

11

Heritage Oaks also focuses on excerpts from reports of what it characterizes as similar projects and asserts that the County imposed a 20-year water supply standard after 1999. Heritage Oaks argues that the standard, which the County applied to Heritage Oaks, is denial of any project that might increase the overdraft of water.

At the hearing before the Board, Alana Knaster, deputy director of the Resource Management Agency, refuted Heritage Oaks' argument: "I do want to however go over some of the bases for approval of the subdivisions that are on the map in front of you, and I'm not going to quote letter and verse for each of these, but generally a number of these projects that have been approved by the board were in the coastal zone. And in the coastal zone, the rules were slightly different. We do look at long-term supply, but there also is an ordinance in effect in that area that talks about how many new lots could be approved, and some of these projects were approved because we had a number of lots that we still had available that could be approved, and we had not exceeded that cap. [¶] In addition, in some cases projects had a decrease from baseline cessation of agriculture. So in one particular case, a particular subdivision that was growing crops was using 47 acre feet a year of water, and the subdivision was reducing that down to about 11 acre feet a year, and we considered that a net benefit to the aquifer, and that was part of the basis of the board's approval of that particular subdivision. Another subdivision looked at capturing and piping runoff from off-site into a detention basin and thus contributing to a water balance. Another one of the subdivisions had totally different circumstances from today. At the time that several of these subdivisions were considered by the board, the Pajaro Valley Water Management Agency had a project on its books. And as each phase of that project progressed, it did an EIR, the EIR was certified; it then obtained funding for that project; and based on that, the Board was able to conclude that there was a reasonably foreseeable future supply of water that could serve those subdivisions. [¶] As the Board is probably aware, that [Pajaro Valley Water Management Agency] project has now been overturned, based on a number of court cases; and so what had been

12

considered a long-term potential supply of water is no longer available. We don't know of one that's reasonably foreseeably available."

Thus, other applications were approved based on specific factors relating to those projects. These factors included: (1) policies applicable to a particular area, such as the Coastal Zone; (2) a change in use which substantially decreased the amount of overdraft; and (3) a reasonably foreseeable future supply of water from another agency. None of these factors applied to Heritage Oaks' project. The Board also summarized distinguishing characteristics of these other projects in its resolution, and Heritage Oaks has not challenged these findings.[7] Moreover, Heritage Oaks' claim that the County had imposed a moratorium on development in north Monterey County is not supported by the record, since the County approved projects even where there was a negative water balance.

## C. Sufficiency of the Evidence

Heritage Oaks contends that there was no evidence that the County's long-term water supply policy was not met. Heritage Oaks relies on its position that compliance with former chapter 18.51 of the County Code satisfied the County's policy. As previously discussed, we have rejected Heritage Oaks' interpretation of the County's policy.

At issue is whether there was substantial evidence to support the Board's findings that the project was inconsistent with various plans and policies regarding an adequate

---

[7]     Heritage Oaks refers to the following projects: Rancho Los Robles; Rancho Roberto; Danborn; Walker; Sunridge; and Mayr. The Board found, in relevant part: Rancho Los Robles, Rancho Roberto, and Sunridge are in the Coastal Zone; the Danborn application was deemed complete after former County Code chapter 18.51 had expired; Walker is a four lot subdivision with water provided by the Vega Road Mutual Water System; and Mayr is a four lot subdivision in Pajaro and Highlands North.

water supply and that the design of the subdivision was likely to cause serious public health problems.

The Highlands North subbasin is in chronic overdraft. Seawater intrusion resulting from the overdraft condition in the north County area has been an ongoing, serious problem. Heritage Oaks disputes this evidence and claims that "there [are] 912,247 acre feet of water in storage in the Highlands Northsub-basin."[8]

As the County points out, Heritage Oaks has ignored the distinction between theoretical water and usable ground water. Though the Fugro Report indicated that there were 912,247 acre feet of ground water in storage in Highlands North, it explained that this figure could be misleading because the majority of this water was below sea level. "[U]seable ground water in storage is defined as the volume of ground water above sea level. . . . When water levels decline below sea level, depleted ground water storage is replaced with sea water. By this definition, . . . some useable storage remains in the Highlands subareas. . . . [¶] The reduction of useable storage capacity in these areas is the result of chronic overdraft for the last 40 years. . . . This declining storage is manifest as declining water levels throughout the area." The Fugro Report also concluded that the Highlands North subbasin was in chronic overdraft. Moreover, the Kleinfelder Report found that seawater intrusion "could be expected now or in the near future in the vicinity" of the project and "[i]ncreased rates of ovedrafting the basin may increase the rate of seawater intrusion in the Highlands North area." Thus, there was substantial evidence that the project was located in an area with a serious and persistent water shortage.

---

[8] Relying on the Board's resolution on the Rancho Roberto application in 2005 for a development permit in the Coastal Zone, Heritage Oaks also claims that "the region had at least 119 years at full build-out." As previously noted, the County used other factors in determining whether to approve that project. In any event, it is not clear how water calculations in 2005 on another project would be relevant to the present case.

Noting that the water recharge system was based on conservative estimates and relying on the Kleinfelder and Fall Creek Reports and the final EIR, Heritage Oaks argues that there was overwhelming evidence that its water recharge system would work.

The Kleinfelder Report stated "The results of the water-balance evaluations presented in this report suggests that, if the Heritage Oaks subdivision is developed as outlined herein, water entering the subsurface at the project site should increase by about 1.3 ac-ft/yr compared to conditions before development." The Fall Creek Report concluded: "The water balance between the project site and the aquifer is positive for the pre-project condition and is more positive for the post-project condition." The final EIR stated: "The drainage facilities recommended by the Fall Creek Engineering Revised Drainage Analysis and Preliminary Drainage Plan, and reiterated in the Revised Hydrogeologic Assessment indicate that implementation of the proposed project would increase groundwater recharge by 1.3 acre-feet per year resulting in a beneficial impact to groundwater. Therefore, the proposed project would not have adverse cumulative impacts with regard to water supply, overdraft conditions, or seawater intrusion."

However, as explained in both the final EIR and the Kleinfelder Report, the conclusion that the project would increase groundwater recharge relied on several assumptions: collected stormwater would be infiltrated more efficiently than under natural conditions; water usage by residents would not exceed amounts used in the calculations; the quantity of average rainfall; and the magnitude of the drainage-capture. As the Kleinfelder Report also noted, the quantities of average rainfall and the magnitude of the drainage-capture were "sensitive factors in the water-balance analysis. . . . [I]f the percentage of actual recharge of collected drain water is reduced to 85% or less, the water balance [after development] will be negative."

Moreover, as pointed out in the comments from the public, the calculation of a net positive water balance relied on the assumption that the project's infiltration trenches and stormwater facilities would be operated at 100 percent effectiveness at all times. The

Kleinfelder Report also identified the problem of relying on a stormwater infiltration system as a water recharge system: "The Fall Creek (June 2008) report proposes to collect rainwater from post-development hard surfaces (roofs, paved roads, and other impenetrable surfaces) and recharge the water to the subsurface via infiltration trenches. Because *estimated data of collection facility efficiencies vary widely*, field testing of rainwater collection and transport methods from the point of contact with a hard surface to the infiltration trench should be tested by the applicant's engineer to show what percent loss may actually occur under site conditions. In its June 2008 report, [Fall Creek Engineering] assumes that losses of rainwater from the point of contact with hard surfaces to the infiltration trench will be about 10%. If this estimate is valid, the amount of water that may be collected and directed to the trenches . . . is . . . about 12 [acre feet per year]. *However, small variations in the percent of water infiltrating from the trenches (possibly caused by incomplete maintenance allowing clogging or other degradation of the infiltration practice) may have a significant impact on actual quantities of water that are recharged.*" (Italics added.)

Here, there was substantial evidence of a chronic overdraft condition and deterioration of water from seawater intrusion in the area where the project is located. Though there was evidence that the project would result in a 1.3 acre-foot per year increase in recharge onsite, there was also substantial evidence to support the Board's rejection of this evidence. The theoretical ability of the project to offset the water demand depended on several assumptions, including the amount of rainfall as well as the effectiveness and maintenance of the water recharge system. If there was a decline of five percent in either average rainfall or the effectiveness of the water recharge system, or both, there would be a negative water balance. Thus, there was substantial evidence to support the Board's findings that the project was inconsistent with various plans and policies and that the design of the subdivision was likely to cause serious public health problems.

16

### D. Due Process and Equal Protection Rights

Heritage Oaks contends that it was denied due process when the County failed to apply its long-term water supply policy in effect in 1999. Since we have concluded that the County complied with Government Code section 66474.2 by applying the policies in effect in 1999, this contention is rejected.

Heritage Oaks next argues that it was denied equal protection, because the County approved for development other similarly situated projects and denied its project. When an appellant fails to support a point with reasoned argument and citation to authority, the point is forfeited. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) Since appellant has failed to support his argument, we do not consider this issue.

## III. Disposition

The order is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P. J.

_____
Márquez, J.

*Heritage Oaks, LLC v. County of Monterey*
H040682

18